## COMMONWEALTH *vs.* PERDITE SCOTT.[1]

No. 00-P-576.

Middlesex. June 6, 2001. - September 6, 2001.

Present: LENK, DOERFER, & COHEN, JJ.

*Practice, Criminal,* Motion to suppress, Findings by judge. *Constitutional Law,* Search and seizure. *Search and Seizure,* Probable cause, Threshold police inquiry.

In the circumstances of a judge's allowance of a pretrial motion to suppress all observations, evidence, and statements that were derived from the defendant's arrest in connection with incidents involving rape and other related offenses, this court remanded the case to the motion judge to clarify, supplement in detail, and, where appropriate, correct his findings as to the sequence of events leading up to the arrest and as to what the arresting officer observed or otherwise knew, conduct a further hearing if necessary, and rule on the motion to suppress under the correct legal standard necessitating a justification in the form of either probable cause or reasonable suspicion. [491-496]

INDICTMENTS found and returned in the Superior Court Department, two on September 30, 1998, and five on February 8, 1999, respectively.

A pretrial motion to suppress evidence was heard by *Charles T. Spurlock,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *John M. Greaney,* J., in the Supreme Judicial Court for the county of Suffolk and the appeal was reported by him to the Appeals Court.

*Marian T. Ryan,* Assistant District Attorney (*Mary Ross,* Assistant District Attorney, with her) for the Commonwealth.

*Randall K. Power* for the defendant.

LENK, J. The grand jury returned indictments against the

[1]In two of the seven indictments, the defendant's first name appears as Pendite.

defendant, Perdite Scott, in connection with separate incidents involving two different victims. The first incident took place on the evening of June 2, 1998; the defendant was charged with assault with intent to rape, rape, assault and battery, and indecent assault and battery, all upon Lucy Smith,[2] a woman over the age of fourteen.[3] The second incident occurred on the evening of July 21, 1998, and the defendant was charged with assault and battery, and assault with the intent to rape Jane Doe.

The defendant, asserting that the police did not have reasonable suspicion to justify an investigatory stop or probable cause to arrest, brought a motion to suppress all observations, evidence, and statements, including identifications made via photographic arrays, that were derived from the defendant's arrest on the evening of September 8, 1998. After an evidentiary hearing at which only one witness — the arresting officer — testified, the motion judge allowed the motion to suppress. The case was reported to us by a single justice of the Supreme Judicial Court, who allowed the Commonwealth's application for leave to appeal from the allowance of the suppression motion.

On appeal, the Commonwealth contends that the motion judge erred in allowing the motion. The judge determined that the initial encounter between the arresting officer and the defendant was an illegal warrantless seizure and that subsequent contacts between them were similarly improper. The Commonwealth asserts that certain of the motion judge's findings were clearly erroneous because they were either at variance with or failed to incorporate what the Commonwealth maintains was uncontroverted testimony, and that the erroneous findings, coupled with certain errors of law, require reversal.

*The judge's findings.* On September 8, 1998, at approximately 8:30 P.M., Sergeant David Benoit of the State police was driving in a marked cruiser on Greenough Boulevard[4] in Cambridge, toward Watertown, when he saw a black male walking in the

---

[2]The victims' names have been altered to preserve their confidentiality. G. L. c. 265, § 24C.

[3]The defendant was also charged with rape as a second or subsequent offense. G. L. c. 265, § 22(*b*).

[4]The street is designated Greenough Boulevard in the hearing transcript.

opposite direction about 100 feet away. Benoit, believing that the defendant fit the general description (black male over six feet tall) of an assailant in two sexual assaults that took place in that general area at approximately the same time of night on June 2 and July 21, 1998, turned his cruiser around to follow the defendant. As he reversed direction, Benoit saw the defendant leave the sidewalk and go down a dirt path toward an area known to him as a place where homosexual men gather. Benoit drove onto the shoulder of the road and stopped about 40-50 feet away from the defendant. Wearing his State police jacket, Benoit stepped from his cruiser, turned the cruiser's spotlight on the defendant, and told the defendant to come back to him because he wanted to talk to him.. After the defendant obeyed and began walking toward Benoit, and as he was approximately 20 feet away from the cruiser, Benoit ordered the defendant to stop and to remain there. Benoit ordered the defendant to place on the ground a black bag he was carrying. At all times, the cruiser spotlight was on the defendant.

Benoit then radioed for assistance and, upon the other nearby trooper's arrival, the two officers approached the defendant. As Benoit questioned the defendant, the other trooper searched the defendant's bag; he found a number of condoms. The defendant gave his name when asked. When asked his middle name, he told Benoit it was "Lee," a name matching the middle name given by the assailant to one of the victims in the sexual assault cases that Benoit then had under investigation. Benoit then had the defendant sit in the rear of the other trooper's cruiser, and, once seated there, the defendant was advised of his Miranda rights and signed a Miranda form. The defendant then answered Benoit's questions, telling him (1) that he lived in Cambridge with his sister; (2) that he had taken the bus from Central Square; and (3) that he had a criminal record including a conviction for rape. The defendant denied that his mother was Indian or that he had ever used the name Barnes.[5] Benoit then asked the defendant whether he would be willing to be viewed by a

---

[5]According to Benoit's testimony, which we discuss at length below, one of the victims reported that her assailant had told her his name was Michael Lee Barnes and that his mother was of American Indian heritage. He also told her that he lived in Cambridge with his sister and that he had taken the Watertown Mall bus.

couple of women for identification purposes, and the defendant replied that Benoit was trying to "jam him up." When asked if he wanted a lawyer, the defendant said that he was not sure. Benoit then told the defendant he was under arrest for rape and the defendant was thereafter transported to police barracks where he was photographed. The photo taken, as part of an array, was shown to the July victim and she identified the defendant as her assailant.

On the basis of these findings, the judge concluded that the defendant was seized the moment that Benoit "stopped him from 40-50 feet away and told the defendant to come back and talk to him. This was not a situation where a police officer approached a defendant and ask[ed] him if he would be willing to answer a few questions. A uniformed sergeant turned his cruiser spotlight on the defendant and told him to walk back forty to fifty feet to speak with him. At all times, Sergeant Benoit directed the defendant's movement, leaving the defendant no choice but to submit to his clear show of authority." The judge characterized what the sergeant had said to the defendant as a "command" that the defendant "obeyed." At the time of this seizure, the judge found, the basis of Benoit's suspicion was his belief that the defendant fit the general description of a black man over six feet tall who was walking in the same vicinity where the two prior sexual assaults had occurred. The judge determined that, prior to the stop, Benoit had neither ascertained any additional physical characteristics of the defendant along the lines that had been described by the victims that would serve to distinguish him from any other black man in the area, nor observed the defendant engaging in any suspicious or criminal activity. Accordingly, the judge ruled, the Commonwealth failed to show that Benoit had sufficient articulable facts on which he could have based a reasonable suspicion that the defendant had committed a crime. Absent a showing of reasonable suspicion to justify the stop, the judge concluded that all evidence obtained as a result of the illegal seizure must be excluded.[6]

*Benoit's testimony.* The judge's findings do not track Benoit's

---

[6]The judge also ruled that the defendant was placed under arrest when Benoit told him to sit in the cruiser. He concluded that there was no justifica-

testimony in at least the following respects, as to which the Commonwealth asserts critical errors in such findings. First, Benoit testified that, when he first saw the defendant from about 100 feet away, Benoit could see that, consistent with descriptions provided by the victims of their assailant, the defendant was very muscular, as well as at least six feet tall, over 200 pounds, black, male, with short hair, and wearing a tee shirt and shorts.[7] The judge found that, at that point, Benoit saw only that the defendant was a black male over six feet tall. Second, Benoit testified that when he saw the defendant from about 20 feet away, he also observed that the defendant had thick lips and facial markings similar to pock marks or freckles as described by one of the victims. In contrast, the judge made no findings as to what, if anything, Benoit observed about the defendant's physical characteristics from 20 feet away. Third, Benoit testified, contrary to the judge's finding, that he did not ask the defendant to put his bag on the ground when he stopped about 20 feet from the cruiser. Fourth, Benoit testified that when the defendant was seated in the cruiser he stated that he had taken the Central Square to Watertown Mall bus, consistent with the statement made to the first victim by her assailant, who mentioned taking the Watertown Mall bus. In contrast, the judge

tion for the use of this additional restraint as part of an investigatory stop, since, contrary to Benoit's testimony, there was no reasonable concern about the safety of the police officers or the public: backup had arrived, and a search of the defendant's person and bag had already revealed that the defendant was unarmed. Further, the defendant had been compliant with Benoit's orders and had not made any movements suggesting he was a flight risk. Moreover, Benoit had no information prior to this arrest that would constitute probable cause to arrest; the only additional information he had obtained was the defendant's generic middle name.

[7] Benoit testified that the June victim had described her assailant as a black male, about thirty years old, athletic build, very muscular, over six feet tall, clean-shaven, dark skin, very short hair, thick eyebrows, round eyes, thick lips, very large hands with long fingers, a smoker, and that he had said his name was Michael Lee Barnes. On cross-examination, Benoit agreed that she had further described the assailant as having a long face, a thick voice, and that he was "very presentable, not a strong African-American persuasion." Benoit testified that the July victim described her attacker as a black male, over six feet tall, very muscular, with very short hair, and with marks or freckles on his face. She also provided these additional details: the assailant was 25-30 years old, thin, about six feet, two inches tall, 175-200 pounds, had no facial hair, and was wearing a black tee shirt and black shorts.

found only that the defendant told the police he had taken a bus from Central Square.

The divergence of the judge's findings from Benoit's testimony in these particulars is of importance, contends the Commonwealth, since the latter would establish, first, that the initial interaction (from 40-50 feet away) was an encounter only and, in any event, that Benoit had reasonable suspicion to justify a threshold inquiry; second, that the stop (from 20 feet away) was a threshold inquiry based on specific, articulable facts and reasonable inferences drawn therefrom that the defendant had committed a crime; third, that asking the defendant to sit in the cruiser was not an arrest and that, after sitting there and receiving his Miranda warnings, the defendant's disclosures provided sufficient additional information to form the requisite probable cause to arrest the defendant.

*Discussion.* It is well established that, when reviewing action on a motion to suppress, "we accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 321 (2001), quoting from *Commonwealth* v. *Sanna*, 424 Mass. 92, 97 (1997). Also, "[t]he determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses . . . ." *Commonwealth* v. *Sinforoso*, *supra*, quoting from *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). In other words, we will ordinarily not disturb the findings of a judge who saw and heard the witnesses, who was free to make credibility determinations and to accept all, some, or none of their testimony, unless there is a showing of clear error in those findings.

The Commonwealth would have us view as clear error both the findings made that are contrary to Benoit's testimony and those that fail to incorporate aspects of the testimony not expressly controverted by other evidence. We have no difficulty with the former, but think that the asserted errors that the judge made in this regard — that Benoit ordered the defendant to put down his bag upon being stopped 20 feet from the cruiser, when no evidence exists to support this finding, and the mischaracterization of the bus route — may ultimately not be of consequence and, in any event, do not suffice to cast fatal doubt

on the judge's other findings which, on the whole, have evidentiary support. As to the latter, the judge's failure to incorporate purportedly uncontroverted testimony, we are not persuaded that the proper course is simply to supplement the judge's findings with Benoit's testimony and jettison whatever in the findings may be at variance with it.

It is true that, in reviewing suppression motions, our courts have on occasion recited subsidiary facts found by the motion judge as supplemented by uncontroverted testimony. See *Commonwealth* v. *Santiago*, 410 Mass. 737, 738 n.2 (1991); *Commonwealth* v. *Watson*, 430 Mass. 725, 726 n.5 (2000); *Commonwealth* v. *Torres*, 433 Mass. 669, 670 (2001); *Commonwealth* v. *Felice*, 44 Mass. App. Ct. 709, 710 n.1 (1998); *Commonwealth* v. *Gant*, 51 Mass. App. Ct. 314, 315 (2001); Smith, Criminal Practice and Procedure § 1347 (1983 & Supp. 2001). Our willingness to do so reflects our confidence that the supplementary material is indeed uncontroverted. Often, our assurance in this regard depends not only upon the fact that the evidence was uncontradicted but also upon our conviction that the motion judge explicitly or implicitly credited the witness's testimony.

We cannot be sanguine here, however, that the judge in fact credited all of Benoit's testimony. We note, for example, that the judge expressly rejected Benoit's explanation as to why he seated the defendant in the cruiser, Benoit having said it was fear for his safety, the judge concluding this was not so. Given this, we are concerned that some of the seemingly uncontroverted additional testimony upon which the Commonwealth relies may have gone unmentioned simply because the judge did not credit it.[8] Contrast *Commonwealth* v. *Kitchings*, 40 Mass. App. Ct. 591, 593 n.4 (1996).

The point is perhaps of less importance with respect to the judge's findings and rulings as to the observations Benoit made from 100 feet and from 40-50 feet away than it is to the judge's findings and rulings as to the officer's observations made from 20 feet away and the sequence of events thereafter.

---

[8] It is conceivable, for example, that the judge may not have believed that Benoit, with the aid of a cruiser spotlight, in fact saw everything that he testified he could and did see from distances of 40-50 feet and 20 feet.

Even if we were to defer entirely to the judge's findings as to what Benoit knew and saw from 40-50 feet away, we think problematic the legal significance that the judge accorded to aspects of the initial encounter. "[N]ot every encounter between a law enforcement official and a member of the public constitutes an intrusion of constitutional dimensions requiring justification." *Commonwealth* v. *Rock*, 429 Mass. 609, 611 (1999), quoting from *Commonwealth* v. *Stoute*, 422 Mass. 782, 789 (1996). A person is seized only "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Commonwealth* v. *Rock*, *supra* at 611 (citations omitted). The judge found that the uniformed sergeant "told [the defendant] to walk back forty to fifty feet to speak with him" while shining his cruiser spotlight on him and that "[t]he defendant obeyed the sergeant's command."

The defendant, a tall black man fitting the general description of an assailant in two prior sexual assaults, who was walking in the same general area and at about the same time as had been the case in each of those prior assaults, had left the sidewalk and was going down a dirt path heading away from Benoit. This was at 8:30 P.M., when visibility was doubtless diminishing. Use of the spotlight to enhance visibility was reasonable in the circumstances and qualitatively quite unlike the use of a siren, flashers or blue lights. See *Commonwealth* v. *Watson*, 430 Mass. at 731; *Commonwealth* v. *Grandison*, 433 Mass. 135, 138-139 (2001). Compare *Commonwealth* v. *Smigliano*, 427 Mass. 490, 491-492 (1998) (activation of cruiser's blue lights in the circumstances a seizure); *Commonwealth* v. *Evans*, 50 Mass. App. Ct. 846, 849 (2001) (activation of cruiser's blue lights did not change nature of encounter). The encounter was in an unconfined public space and there was no evidence that Benoit ordered the defendant to answer his questions, nor that the defendant indicated a wish to leave. See *Commonwealth* v. *Cao*, 419 Mass. 383, 387-388 (1995); *Commonwealth* v. *Rock*, *supra* at 612; *Commonwealth* v. *Wallace*, 45 Mass. App. Ct. 930, 931 (1998). Although in his legal analysis, the judge characterized the sergeant's communication to the defendant as a "command," he had expressly found only that Benoit had "told the

defendant to come back and talk to him," a finding consistent with Benoit's testimony that he had yelled out, "Excuse me, can you come back. I would like to talk to you for a minute."[9] We think that, notwithstanding Benoit's police jacket and the use of his cruiser spotlight, the cases suggest that a reasonable person in the defendant's circumstances could well have believed he was free to leave at the time. "[T]he record here does not support that the police blocked the defendant's course or otherwise controlled the direction or speed of his movement." *Commonwealth* v. *Grandison*, 433 Mass. at 138.

The matter is yet more troubling with respect to what happened when the defendant was 20 feet away from the cruiser. There is no dispute about the fact that, at this point, Benoit ordered the defendant to stop and to remain there; the defendant was not free to leave. It is at this point plain that the sergeant's "interaction with the defendant intruded on the defendant's right to personal security under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, thus necessitating a justification in the form of either probable cause or reasonable suspicion." *Commonwealth* v. *Eckert*, 431 Mass. 591, 593 (2000). "[A] police officer may stop an individual and conduct a threshold inquiry if the officer reasonably suspects that such individual has committed, is committing, or is about to commit a crime. To qualify as 'reasonable,' the officer's suspicion 'must be based on specific, articulable facts and reasonable inferences drawn therefrom.' The standard is objective: 'would the facts available to the officer at the moment of the seizure or the search "warrant a [person] of reasonable caution in the belief" that the action taken was appropriate?' " *Commonwealth* v. *Hill*, 49 Mass. App. Ct. 58, 62-63 (2000), quoting from *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996). "Unparticularized racial

---

[9]The judge's findings as to the tenor and content of Benoit's initial communication to the defendant are to this extent somewhat ambiguous. Given our view that, for other reasons, it is necessary to remand for supplementation and clarification, the ambiguity can be clarified on remand. The judge should expressly find what was said and what if any inferences he draws therefrom, and he may, if necessary, revisit the question whether such communication, in the circumstances, would have caused a reasonable person to believe he was not free to leave.

descriptions, devoid of distinctive or individualized physical details . . . cannot by themselves provide police with adequate justification for stopping an individual member of the identified race who happens to be in the general area described . . . ." *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 67 (1997). See *Commonwealth* v. *Cheek*, 413 Mass. 492, 495-496 (1992).

It is at this juncture that the inadequacies in the judge's findings become especially significant. He made scant reference in his findings to the stop at 20 feet, having focused his attention upon the earlier encounter. As a result, we do not know what it is that the judge believed Benoit had and had not observed or known about the defendant before ordering him to stop and remain where he was. Benoit testified in this regard that, in addition to having seen that the defendant was a black male at least six feet tall, over 200 pounds, muscular, wearing a tee shirt and shorts, and having short hair, he had observed by this point that the defendant had thick lips and certain facial marks, such as freckles or pockmarks, the foregoing being consistent in whole or in part with descriptions given by the victims of their assailant. Because the judge's findings are silent or otherwise insufficient on such key aspects of Benoit's testimony, we are not in a position to determine whether Benoit had reasonable suspicion to justify his order that the defendant stop and remain 20 feet away.

We cannot discern from the judge's findings the reason(s) for his departure from Benoit's testimony in this respect and cannot tell whether the divergence is due to credibility determinations he may have made or to other causes such as simple human error. What is plain to us, however, is that the deficiencies in the judge's findings as to the sequence of events and as to what Benoit observed or otherwise knew at each step along the way put us in no better position to review the judge's rulings as to events subsequent to the stop at 20 feet than as to that stop itself. That is to say, were the judge to find facts constituting reasonable suspicion to justify the 20 foot stop, those same facts would presumably affect the analysis as to whether there was justification for the successive actions taken and inquiries made. See note 6, *supra*; *Commonwealth* v. *Williams*, 422 Mass. 111, 118-119 (1996) (fact-specific inquiry necessary to

determine whether seizure is investigatory stop or an arrest). In such circumstances, we think a remand to the motion judge is warranted so that he may clarify, supplement in detail, and, where appropriate, correct his findings of fact, conduct a further hearing if necessary, and rule on the motion to suppress under the correct legal standard. See *Commonwealth* v. *Eckert*, 431 Mass. at 593; *Commonwealth* v. *Comolli*, 14 Mass. App. Ct. 607, 613-614 (1982); *Commonwealth* v. *Spagnolo*, 17 Mass. App. Ct. 516, 524 (1984), *S.C.*, 20 Mass. App. Ct. 936 (1985). Compare *Commonwealth* v. *Andrade*, 389 Mass. 874, 882 (1983). Contrast *Commonwealth* v. *Barnes*, 20 Mass. App. Ct. 748, 755 (1985); *Commonwealth* v. *Silva*, 21 Mass. App. Ct. 536, 545-546 (1986); *Commonwealth* v. *Medeiros*, 45 Mass. App. Ct. 240, 241 (1998).

Accordingly, the order allowing the defendant's motion to suppress is vacated, and the matter is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*