COMMONWEALTH *VS.* NILTON DASILVA.

No. 01-P-13.

Suffolk. March 13, 2002. - October 8, 2002.

Present: LAURENCE, SMITH, & MILLS, JJ.

*Constitutional Law,* Search and seizure, Investigatory stop, Reasonable suspicion.

The actions of police officers in closely and conspicuously following a lone bicyclist (the defendant) in two marked police cruisers, twice ordering him to "stop" with the unmistakable intent of requiring him to submit to police inquiries, and emerging from a police vehicle in uniform to confront him after he had apparently stopped in response to the repeated orders, constituted police conduct of such an assertive and intimidating nature as to amount to a seizure requiring reasonable suspicion under art. 14 of the Massachusetts Declaration of Rights [224-225]; where, at the moment that the defendant was seized, the police had no reasonable suspicion to believe that he had committed, was committing, or was about to commit a crime, based on specific and articulable facts and reasonable inferences flowing therefrom, in light of the officers' experience and the entirety of the circumstances, the judge at the defendant's pretrial hearing should have granted the defendant's motion to suppress evidence obtained as a result of the seizure, and the judge at the defendant's criminal trial should have granted the defendant's motion for a directed verdict [225-228].

INDICTMENTS found and returned in the Superior Court Department on January 26, 1999.

A pretrial motion to suppress evidence was heard by *Barbara J. Rouse,* J., and the cases were heard by *Diane M. Kottmyer,* J.

*Joseph J. Brodigan, Jr.,* for the defendant.

*Brian J.S. Cullen,* Assistant District Attorney, for the Commonwealth.

LAURENCE, J. The defendant was convicted, following a jury-waived trial, of illegal possession of a handgun (G. L. c. 269, § 10[*a*]), which had an altered serial number (G. L. c. 269, § 11C), and illegal possession of ammunition (G. L. c. 269,

§ 10[*h*]). His sole argument is that the motion judge erred in denying his pretrial motion to suppress the handgun and ammunition which, he claims, were obtained as the result of an investigatory stop not based on reasonable suspicion, in violation of art. 14 of the Massachusetts Declaration of Rights. The motion judge found that the officers had lawfully stopped the defendant upon reasonable suspicion. That finding was based upon the defendant's efforts to evade the officers' attempt to question him about a recent crime and their suspicion that he was carrying a firearm inside his pants. A loaded gun fell out of the defendant's pants as the officers attempted to question him after catching up with him. The defendant maintains that his illegal seizure occurred at the moment the police ordered him to stop rather than the moment identified by the judge. We agree and reverse.

We summarize the findings of the motion judge supplemented by uncontroverted evidence based on the testimony of Officer Leonardo Hernandez of the Boston police department, the arresting officer — testimony which the judge expressly found credible and relied upon for her ruling.[1] See *Commonwealth* v. *Willis*, 415 Mass. 814, 816-817 (1993); *Commonwealth* v. *Watson*, 430 Mass. 725, 726 n.5 (2000).

On November 14, 1998, Detective Jay Greene of the Boston police department went to Boston Medical Center to question the defendant, who had been stabbed earlier that day on Bowdoin Street in the Dorchester section of Boston. The defendant stated that he had been attacked and stabbed in the back by "four guys" but denied knowing who they were, a denial not believed by the detective. Detective Greene later filed a report of his interview with the defendant, which reflected the detective's suspicion that the stabbing related to the many altercations and violent outbreaks between feuding "Hamilton Street" and "Holmes[2] Avenue" factions within the young, male Cape Verdean population in the Bowdoin Street area.

---

[1] One other police officer, Detective Jay Greene, who was not involved in the defendant's seizure, testified at the hearing, but only as to the background facts surrounding the incident, summarized in the paragraph immediately following.

[2] The transcript so spells this street name. There is no "Holmes Avenue" in Dorchester, but there is a "Homes Avenue," which intersects with Bowdoin

On November 16, 1998, Officer Hernandez and other members of the Boston police department who patrolled the Bowdoin Street area received a roll call briefing concerning the stabbing. The briefing mentioned police suspicion that it was another incident of violence between the feuding Cape Verdean youth factions. Officer Hernandez had been patrolling the area for several years and testified to the high rate of violence in the Cape Verdean community.

At about 3:20 P.M., Officer Hernandez was standing beside his marked cruiser on Bowdoin Street with Officer Berlino Felix when he noticed the defendant, who was known to him. The defendant was riding a bicycle with his left hand while his right hand was placed inside the middle of his pants. Officer Hernandez mentioned to Officer Felix that the defendant was the person recently stabbed.

The two police officers, in separate cruisers, followed the defendant. They observed that he continuously kept his right hand in the middle of his pants as he rode. Officer Hernandez pulled abreast of the defendant and said that he would like to talk to him. The defendant slowed down as if to stop but, as Officer Hernandez stepped out of his cruiser, the defendant sped off on his bicycle. At the moment Officer Hernandez pulled abreast of the defendant, he developed a suspicion that the defendant was carrying a firearm. That suspicion was based upon the defendant's recent stabbing, the reported police suspicion that the stabbing had been yet another violent incident between the two Cape Verdean factions, the frequency of retaliations among young Cape Verdean males, and the defendant's act of continuously holding his right hand within his pants. These factors, the judge concluded, justified the two officers' pursuit of the defendant in their cruisers upon his taking off on his bicycle.

Shortly after the pursuit began, the defendant fell off his bicycle, face-first onto the ground. The officers stopped, approached him, and performed an initial pat-down as he lay on the ground, his right hand still inside his pants. They then stood

Street and is presumably the street referred to. See *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 69 n.9 (1997).

him up, whereupon the firearm fell through one leg of his baggy pants onto the ground.

These findings, on the basis of which the judge denied the motion to suppress, did not comport with the unchallenged testimony of Officer Hernandez, the sole testifying witness to the circumstances of the challenged seizure. The findings failed to mention Officer Hernandez's testimony that he expressly ordered the defendant to "stop" three separate times before the pursuit: first, as he pulled his cruiser alongside the defendant to have him stop and talk; second, as the defendant appeared to ignore him and continued pedalling; and finally, after the defendant slowed down, appeared to stop, but then got back on his bicycle and sped off as Officer Hernandez stepped out of his cruiser. The officer also testified that his concern that the defendant might possess a weapon first arose only after the defendant fled at a high rate of speed following his false stop while keeping his right hand inside his pants.

We do not disturb subsidiary findings of a judge on a motion to suppress, provided they are "warranted by the evidence," *Commonwealth* v. *Ramos*, 430 Mass. 545, 546 (2000), and are not infected by "clear error," *Commonwealth* v. *Sanna*, 424 Mass. 92, 97 (1997), while we review de novo ultimate findings and conclusions of law, particularly those of constitutional dimension. *Commonwealth* v. *Cruz*, 373 Mass. 676, 682 n.2 (1977). Applying those standards to the instant record, we discern clear error in the judge's subsidiary findings and legal error in her ultimate findings, with respect to both the circumstances of the defendant's seizure and whether reasonable suspicion existed to effect it.[3] See *Commonwealth* v. *Holley*, 52 Mass. App. Ct. 659, 664 (2001).

---

[3]Although the clear error standard is a very limited form of review in cases where the motion judge's findings rest on determinations of credibility and resolution of conflicting testimony, see *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), this case does not implicate that confining principle. It does not involve any conflicting testimony, but rather a single police witness's uncontradicted testimony that the motion judge explicitly found to be credible, contrast *Commonwealth* v. *Scott*, 52 Mass. App. Ct. 486, 492 (2001), with no intimation that the judge did not credit that testimony in its entirety. See *Commonwealth* v. *Alvarado*, 423 Mass. 266, 268 n.2 (1996); *Commonwealth* v. *Redd*, 50 Mass App. Ct. 904, 904 n.3 (2000); *Commonwealth* v. *Chongarlides*, 52 Mass. App. Ct. 366, 372 n.8 (2001).

"[D]etermining the precise moment of seizure [is] critical to resolution of the issue of suppression." *Commonwealth* v. *Barros*, 435 Mass. 171, 173 (2001). The judge's finding that the defendant was not seized for constitutional purposes until the police began pursuing him following his false stop and subsequent flight is contradicted by Officer Hernandez's testimony. The officer stated that he called for the defendant to "stop" twice before the defendant slowed down and then again as the defendant sped away after apparently feigning a stop. By overlooking these commands that the defendant stop, the judge committed a factual and a legal error regarding the crucial issue of fixing the moment of the defendant's seizure.

A person is constitutionally seized by a law enforcement officer "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" without submitting to police questioning. *Commonwealth* v. *Stoute*, 422 Mass. 782, 786 (1996), quoting from *Commonwealth* v. *Borges*, 395 Mass. 788, 791 (1985). Although a police officer does not violate art. 14 by merely approaching an individual in the street or other public place and requesting him to answer questions, a seizure may be found "where the police have engaged in some 'show of authority' which could be expected to command compliance, beyond simply identifying themselves as police." *Commonwealth* v. *Sanchez*, 403 Mass. 640, 644 (1988), quoting from *United States* v. *West*, 651 F.2d 71, 73 (1st Cir. 1981), vacated on other grounds, 463 U.S. 1201 (1983), cert. denied, 469 U.S. 1188 (1985). See *Commonwealth* v. *Barros*, 435 Mass. at 172, 174, 176 (after the defendant had ignored police officer's earlier request — "Hey you . . . I want to speak with you" — officer exited vehicle, approached defendant, pointed to him and said, "Hey you. I wanna talk to you. Come here"; second request had a "compulsory dimension to it" that "communicat[ed] what a reasonable person would understand as a command that would be enforced by the police power" and constituted a seizure).

Closely and conspicuously following a lone bicyclist in two marked police cruisers, twice ordering him to "stop" with the unmistakable intent of requiring him to submit to police inquir-

ies, and emerging from a police vehicle in uniform to confront him after he had apparently stopped in response to the repeated orders, constituted police conduct of such an assertive and intimidating nature as to amount to a seizure requiring reasonable suspicion under art. 14.[4] See *Commonwealth* v. *Thibeau*, 384 Mass. 762, 763-764 (1981); *Commonwealth* v. *Barros*, 435 Mass. at 174-176; *Commonwealth* v. *Scott*, 52 Mass. App. Ct. 486, 494 (2001); *Commonwealth* v. *Mock*, 54 Mass. App. Ct. 276, 278-279 (2002); *Commonwealth* v. *Smith*, 55 Mass. App. Ct. 569, 571-573 (2002).

The judge again erred factually and legally in resolving the second question in the required analysis under art. 14: at the moment the defendant was stopped in the constitutional sense, i.e., when he was seized, did the police have reasonable suspicion to believe that he had committed, was committing, or was about to commit a crime, based upon specific and articulable facts and reasonable inferences flowing therefrom, in light of the officers' experience and the entirety of the circumstances? See *Commonwealth* v. *Silva*, 366 Mass. 402, 405-406 (1974); *Commonwealth* v. *Stoute*, 422 Mass. at 790.

We see no objective basis in the evidence for reasonable suspicion at the time the defendant was seized as described above, or even at the subsequent moment when the judge determined he had been seized (i.e., when the police pursued him after he sped off on his bicycle following his false stop).[5]

From the moment of the officers' first observation of the defendant until he slowed down and virtually halted pursuant to Officer Hernandez's second order to stop, the record shows (and the officer candidly admitted) that the police had no evidence or

---

[4]The final command to the defendant to stop, as he rode away after slowing down as if to stop, merely reiterated the already manifested police intention not to allow the defendant to leave the area without first acquiescing to their demand that he stop and respond to their questions — the functional equivalent of a seizure. See *Commonwealth* v. *Stoute*, 422 Mass. at 789.

[5]The defendant's eventual refusal to submit to the police show of authority by engaging in flight and evasion did not change the character of the encounter for art. 14 purposes. Events subsequent to police pursuit or seizure, including efforts to elude or flee from the police, cannot be used to supply the requisite reasonable suspicion to justify the prior police action. See *Commonwealth* v. *Thibeau*, 384 Mass. at 763-764; *Commonwealth* v. *Wren*, 391 Mass. 705, 708 n.2 (1984).

information — much less specific and articulable facts — creating the slightest suspicion that the defendant had committed,[6] was in the course of committing, or was about to engage in any criminal conduct.

The record contains no evidence that the police knew of any actual or alleged violent behavior on the defendant's part, including possession or use of firearms or other weapons (see note 6, *supra*). Officer Hernandez conceded that nothing about the defendant's conduct as he bicycled away from the pursuing police, including his keeping his right hand inside his pants as he rode, was perceived by the police as threatening their or the public's safety until he fled after Officer Hernandez got out of his cruiser to question him. Contrast *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. 41, 43-44 (2002) (as defendant attempted to evade police observation in a high crime area where firearms offenses were common, he made a quick movement that police perceived as the imminent use of a concealed weapon).

Even at that point, the factors recounted by Officer Hernandez as creating his suspicion that the defendant might have a weapon did not provide adequate bases for any reasonable suspicion that the defendant was previously, then, or would soon be engaged in criminal activity. Taken together, those factors — the defendant's recent stabbing, police perception of a high rate of violence in the local Cape Verdean community, police "suspicion" that Cape Verdean youths from Homes Avenue were the defendant's assaulters, police concern about recent feuding and vengeful violence between those youths and rivals from Hamilton Street, the fact that the defendant was from the Hamilton Street area, and the persistent position of his right hand in his pants — amounted to no more than a hunch that because the defendant had been the victim of a stabbing, he

---

[6]Officer Hernandez's testimony was that he recognized the defendant from having "r[u]n into him on different [prior] occasions." It was devoid of specifics about those occasions and provided no basis for a finding that the defendant had ever been involved in, or even suspected of, committing any crime or using or carrying a firearm or weapon of any sort.

might be inclined to be carrying a weapon and seeking revenge against his assailants.[7]

Neither the defendant's presence in a "high crime area" nor his efforts to avoid interaction with the police provided the officers with reason to stop him in the absence of any known criminal conduct attributable to him, or of any illegal or suspicious actions on his part observed by them. See *Commonwealth v. Thibeau*, 384 Mass. at 763-764; *Commonwealth v. Cheek*, 413 Mass. 492, 496 (1992).

Moreover, nothing in the record demonstrated any connection between the defendant's stabbing and the problems in the Cape Verdean community. No evidence indicated any involvement by the defendant in the retaliatory violence among feuding Cape Verdean youth factions. There was no evidence that the defendant was himself of Cape Verdean descent. The police suspicion that the defendant might have been on his way to exact vengeance for his stabbing was also belied by the observable facts; when he was sighted (as well as while he was being followed), the defendant was riding in a direction away from Homes Avenue, the "turf" of his supposed assailants.

The judge's reliance on police concern about the defendant's involvement in retaliatory Cape Verdean violence involving the defendant was, consequently, unfounded on the evidence presented. Nor was her ruling shored by her finding that police pursuit was justified by their suspicion that the defendant was carrying a firearm. Reasonable suspicion justifying an investigatory stop cannot be founded on police belief (whatever its source) that a person is carrying a concealed firearm in the absence — as was the case here — of any evidence of suspi-

---

[7]See *Commonwealth v. Silva*, 366 Mass. at 406. See also *Terry v. Ohio*, 392 U.S. 1, 27 (1968) (unparticularized suspicions or hunches not grounded on specific and articulable facts cannot validate a seizure). Contrast *Commonwealth v. Stampley*, 437 Mass. 323, 330 (2002) ("[W]hat began as a 'hunch' gradually acquired an objective basis for genuine concern [based upon the defendant's repeated furtive movements of apparent concealment and reflected a] measured response gauged to the precise unfolding of the encounter, rather than [a] hasty reaction to the first ambiguous suggestion of possible trouble").

cious conduct by that person indicative of criminal activity[8] or of an imminent threat to police or public safety. See *Commonwealth* v. *Couture*, 407 Mass. 178, 183, cert. denied, 498 U.S. 951 (1990); *Commonwealth* v. *Alvarado*, 423 Mass. 266, 268-271, 274 (1996); *Commonwealth* v. *Barros*, 435 Mass. at 176-178. Contrast *Commonwealth* v. *Foster*, 48 Mass. App. Ct. 671, 673-677 (2000).

Because the evidence did not provide the police with objectively reasonable suspicion to justify the pursuit and seizure of the defendant, his motion should have been allowed, and the handgun and ammunition discovered as the direct fruits of the police stop, suppressed. See *Commonwealth* v. *Spofford*, 343 Mass. 703, 705-708 (1962). See also *Wong Sun* v. *United States*, 371 U.S. 471, 478, 486-488 (1963).[9] Had the motion to suppress been allowed, there would have been no evidence to support the defendant's convictions. His trial motions for a required finding of not guilty should, therefore, have been allowed.

*Judgments reversed.*

*Findings set aside.*

*Judgments for defendant.*

---

[8]It is well established that even a reliable report that a person is carrying a firearm is insufficient to give rise to reasonable suspicion that such possession is illegal. See *Commonwealth* v. *Barros*, 435 Mass. at 177-178. Nothing in the evidence indicates that the appearance of the twenty year old defendant at the time of the incident provided a rational basis for the police to suspect that he was under the age at which he could be lawfully issued a license to carry firearms. Compare the concurring opinions, *id.* at 179 & n.1, and *Commonwealth* v. *Barros*, 49 Mass. App. Ct. 613, 620-621 (2000).

[9]The defendant's motion to suppress was also directed to statements he had made after being arrested following his seizure and search. Although one of the arresting officers testified at trial to statements the defendant made after he was booked and given Miranda warnings ("[T]hey stabbed me. I was trying to protect myself"), nothing was said about his statements at the hearing on the motion, and neither brief contains reasoned arguments about them. To the extent the Commonwealth relied at trial on such statements by the defendant, they, too, should have been suppressed and were also improperly admitted (over the defendant's objection) under the "fruit of the poisonous tree" doctrine reflected in the cited authorities, because of the direct causal link between the illegal stop, the defendant's arrest, and his making the statements. See *Commonwealth* v. *Benoit*, 382 Mass. 210, 214-216 (1981); *Commonwealth* v. *Borges*, 395 Mass. at 795-797; *Commonwealth* v. *Bishop*, 402 Mass. 449, 450-452 (1988).