Krupp, Peter B., J.
This matter is before the court on two motions to suppress filed by defendant Ricky Bethune (“Bethune”): a Motion to Suppress Evidence (docket #26), which seeks to suppress the fruits of the stop and arrest of Bethune on April 17, 2012, including statements he allegedly made shortly after he was stopped; and a Motion to Suppress Identification (docket #27), which overlaps in its effort to suppress the fruits of Bethune’s April 17, 2012 arrest and also seeks to exclude the one-on-one show-up identification of Bethune by a police officer.
The court conducted an evidentiary hearing on both motions on May 31, 2013. Bethune represented himself at the hearing. Bethune had been represented by a number of attorneys in this matter. On May 14, 2013, he appeared before the court (Lemire, J.), waived his right to appointment of counsel, and elected to proceed without counsel. At the hearing on May 31, 2013, Bethune confirmed his intention to represent himself.
At the consolidated hearing on the two suppression motions, the Commonwealth called two witnesses: Worcester Police Officers Alan Gemme and Scott Pulsi-fer. Various exhibits were introduced. Based on the evidence introduced at the hearing, the court finds the following facts.
FINDINGS OF FACT
At approximately 11:10a.m. onApril 17, 2012, Off. Gemme, a 26-year veteran of the Worcester Police Department, was in the vicinity of Palma’s Bakery near Rice Square in Worcester, Massachusetts. He had *261 stopped there because his brother, the Worcester Chief of Police, and the deputy chief were there having coffee. Off. Gemme heard a burglar alarm going off at a house nearby with an address of 3 Acton Street. The alarm was loudly announcing and repeating words to the effect: “you are an intruder . . . the police have been called.” Off. Gemme was familiar with such alarms and was aware it was not a fire alarm.
Off. Gemme walked to the property that was behind the house at 3 Acton Street. From that position, he saw the blinds on a sliding glass door in the back of 3 Acton Street begin to ruffle and then a black male exited from the sliding glass door. According to Off. Gemme, the individual was wearing a medium blue tank top and blue pants. There was some brush and a broken fence between the individual and the place where Off. Gemme was standing. Off. Gemme, who was in uniform with his badge showing, said “hey” to the person who had emerged from 3 Acton Street. At that point, the individual turned and began running. Off. Gemme went through the brush and the broken fence and starting running after the suspect. He yelled to the suspect, identifying himself as a police officer and directing the suspect to stop. The suspect did not stop.
Off. Gemme continued in pursuit. The deputy chief also gave chase on foot. Off. Gemme followed the suspect for about 20-25 seconds, from behind 3 Acton Street, onto Acton Street, through Rice Square and about 100 feet up Plantation Street before losing sight of the suspect. The deputy chief was still in pursuit. (Neither parly called, or indicated a need to call, the deputy chief as a witness at the hearing.)
The police radio broadcast a description of the suspect as a black male with a blue tank top and blue jeans. It also broadcast that the suspect was heading up Plantation Street, possibly in the back yards heading toward Grafton Street. The announced direction of the suspect’s travel—through backyards on Plantation Street toward Grafton Street—was in the direction of the Worcester East Middle School (“the Middle School”). Between three and ten minutes after the first radio call, Off. Pulsifer, who was on patrol in the area, observed a black male with a blue shirt, running across Dorchester Street near Arthur Street in the vicinity of the Middle School and about two blocks away from where Off. Gemme lost sight of the suspect. The black male turned out to be Bethune. Bethune, however, was wearing khaki or tan shorts, not blue jeans. Off. Pulsifer observed Bethune to be sweating and to go into a fenced alcove associated with the Middle School and tuck down to hide behind a dumpster.[1]
Off. Pulsifer approached Bethune behind the "dumpster. Bethune identified himself and provided his date of birth. He was cooperative. Off. Pulsifer did a warrant check on Bethune and found that there was an active warrant for his arrest on a breaking and entering charge. Off. Pulsifer then placed Bethune under arrest on the warrant and told him that he was a suspect in the breaking and entering offense that had just occurred.
Meanwhile, Off. Gemme’s brother, the Chief of Police, had picked up Off. Gemme after he lost sight of the suspect on Plantation Street. Within a couple minutes of Off. Pulsifer apprehending Bethune, Off. Gemme arrived by car at Off. Pulsifer’s location at the Middle School. When Off. Gemme walked up, Bethune was in handcuffs on the ground. When he saw Off. Gemme, Bethune stated to the effect that he recognized Off. Gemme, that he (Off. Gemme) was the large man who had been chasing him and/or that he (Off. Gemme) was the one he (Bethune) was afraid of.[2] Off. Gemme told Off. Pulsifer that he (Off. Gemme) recognized Bethune as the person who had come out of the house at 3 Acton Street.[3]
DISCUSSION
A. Lawfulness of the Stop
Off. Pulsifer stopped the defendant in the fenced alcove associated with the Middle School where the defendant was hiding behind a dumpster.[4] The Commonwealth bears the burden to prove that the police had reasonable suspicion before initiating a stop. See Terry v. Ohio, 392 U.S. 1, 21 (1968); Commonwealth v. Comtta, 441 Mass. 86, 91 (2004) (and cases cited). Whether a Terry stop is constitutional depends on the facts known to the officer at the time of the stop. The question is whether based on articulable facts and specific reasonable inferences, the officer had a reasonable suspicion that the person stopped was committing, had committed or was about to commit a crime. Commonwealth v. Bostock, 450 Mass. 616, 619 (2008); Commonwealth v. Silva, 366 Mass. 402, 405-06 (1974). ‘The facts and inferences underlying the officer’s suspicion must be viewed as a whole when assessing the reasonableness of his acts.” Commonwealth v. Thibeau, 384 Mass. 762, 764 (1981). Amere hunch or good faith belief will not be sufficient. Rather, the information known to the officer must support an objective and particularized basis to conclude that a crime has been, is being, or is about to be committed by the person stopped. Commonwealth v. Walker, 443 Mass. 867, 872 (2005); Commonwealth v. McKoy, 83 Mass.App.Ct. 309, 312 (2012); Commonwealth v. Clark, 65 Mass.App.Ct. 39, 43-44 (2005). In this context, the question is whether the Commonwealth has shown that Off. Pulsifer had a reasonable basis to suspect that Bethune was the person who the police were chasing for the breaking and entering at 3 Acton Street.
The court concludes based on the credible testimony at the evidentiary hearing that Off. Pulsifer at the time of the stop had a reasonable suspicion that Bethune had just committed the breaking and entering at 3 Acton Street. Off. Pulsifer was aware the police were in pursuit of a suspect in the breaking and *262 entering in the vicinity of Plantation Street and Grafton Street, and that the suspect may be heading in the direction of the Middle School. He observed the defendant, who he believed matched the description of a black male with a blue tank top, running and sweaty in the vicinity of the Middle School, and saw him attempt to hide behind a dumpster in a fenced alcove.
Although Off. Pulsifer testified that he did not remember any other portion of the radioed description of the suspect, the court finds that Off. Pulsifer almost surely knew at the time that the description was for a black male with a blue tank top and blue jeans. The fact that the defendant was wearing khaki shorts instead of blue jeans does not eliminate the reasonable suspicion Off. Pulsifer had for stopping Bethune. Oftentimes radioed descriptions for suspects are not completely accurate. The police may take account of the possibility that some facts broadcast over the radio are mistaken. Commonwealth v. Lopes, 455 Mass. 147, 158 (2009); Commonwealth v. Ancrum, 65 Mass.App.Ct. 647, 651-52 (2006); Commonwealth v. Emaukpor, 57 Mass.App.Ct. 192, 198 (2003). Here, Bethune was running in the predicted direction only a couple blocks from where the police lost sight of the suspect and only a few minutes thereafter. He was a black male with a blue shirt, and acted suspiciously, attempting to hide himself behind a dumpster in a fenced alcove. Even though the color of his pants did not match the radioed description of the suspect’s pants, these facts were sufficient to give Off. Pulsifer reasonable suspicion to stop Bethune. The stop of Bethune was therefore constitutional.
Once stopped, Bethune provided his name and identifying information to Off. Pulsifer, who ran a computer check and learned of an active warrant for Bethune’s arrest. Only then did Off. Pulsifer place Bethune under arrest. The arrest of Bethune on the outstanding warrant was also lawful. See, e.g., Commonwealth v. Lobo, 82 Mass.App.Ct. 803, 808-10 (2012).
B. Defendant’s Statement
Because there was no unlawful stop or arrest, there is no question here about whether the defendant’s statements made upon seeing Off. Gemme should be excluded as the fruits of the poisonous tree. Common-wealthv. Borges, 395 Mass. 788, 795 (1985); Commonwealth v. Bishop, 402 Mass. 449, 451-52 (1988). The only questions are whether Bethune’s statements were made voluntarily and whether they resulted from custodial interrogation.
There was no evidence introduced at the hearing that Bethune was given his Miranda warnings in the few minutes after he was stopped and before he made his statements upon seeing Off. Gemme. Miranda warnings are required only when a person in custody is subjected to either direct questioning or its functional equivalent, Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); Commonwealth v. Torres, 424 Mass. 792, 796-97 (1997) (and cases cited), which is assessed objectively based on “whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances.” Commonwealth v. Braley, 449 Mass. 316, 324 (2007), quoting Torres, 424 Mass, at 797.
Bethune’s statements upon seeing Off. Gemme were not made in response to interrogation or its functional equivalent. Here neither express questioning, nor light casual conversation between the police and Bethune, triggered Bethune’s statements. Rather, when Off. Gemme walked up to the area where Bethune had been arrested, Bethune blurted out his statements. Such spontaneous statements are even less a product of interrogation than the statement made in Braley, which occurred during light conversation and banter while the police were transporting the defendant on a commercial airline and which was found not to be the result of interrogation. 449 Mass, at 324. See also, e.g., Commonwealth v. Rodriguez, 75 Mass.App.Ct. 235, 239-40 (2009) (question by police officer to suspect in custody about whether he had any money for his children not “designed to elicit an incriminating response”). Because Bethune’s statements upon seeing Off. Gemme were not the product of interrogation or its functional equivalent, there is no reason they should be suppressed.
C. Off. Gemme’s Identification of Bethune
Bethune also seeks to suppress the one-on-one show-up identification made by Off. Gemme while he (Bethune) was being detained by Off. Pulsifer less than 15 minutes after the breaking and entering at 3 Acton Street and while Bethune was on the ground in handcuffs a few blocks away from where Off. Gemme lost sight of the fleeting suspect.
Mistaken witness identification poses a significant threat to the truth-finding process of criminal trials. As the Supreme Judicial Court has long-recognized, “mistaken identification is believed widely to be the primary cause of erroneous convictions.” Commonwealth v. Johnson, 420 Mass. 458, 465 (1995) (and authorities cited). For these reasons, courts have taken steps to try to reduce the role suggestion may play in witness identification procedures. See Neil v. Biggers, 409 U.S. 188, 198 (1972) (“Suggestive confrontations are disapproved because they increase the likelihood ofmisidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous”).
Whether the process of asking a question is unduly suggestive is ordinarily thought to concern whether the manner of presenting a question, or the question itself, necessarily suggests, or might influence a person to provide, a particular answer. That is, one looks to whether the way the question is presented affects the accuracy of the answer. In the context of eyewit *263 ness identification, the reliability analysis ordinarily looks to whether the circumstances of displaying a person to a witness suggest to the witness, however slightly, that the person (or one of the choices among many) is the person the police believe to be the suspect. Although law enforcement, with some encouragement from the courts, has, for example, adopted procedural safeguards to reduce the sug-gestivity in the presentation of photo arrays, see, e.g., Commonwealth v. Silva-Santiago, 453 Mass. 782, 797-98 (2009), in the context of one-on-one show-up identifications, the courts have relegated reliability (or excessive suggestivity) analysis to the backseat, preferring to focus on law enforcement expediency or “necessity,” as the courts have deferentially defined that term.
Although courts have routinely recognized the inherently suggestive nature of show-up identifications, and have widely criticized them, Commonwealth v. Martin, 447 Mass. 274,279 (2006) (“(o)ne-on-one identifications are generally disfavored”); id. at 291-312 (Cordy, J., dissenting); courts have done little to curtail the practice. The law in Massachusetts does not focus on questions surrounding the inherent sug-gestivity of the show-up and the reliability of the witness’s identification—e.g. the duration of the witness’s observation of the perpetrator; whether the temporal proximity of the initial observation in the particular case increases reliability (i.e. the witness’s memoiy in freshest) or increases suggestivity (i.e. a person apprehended by the police close to an event may be perceived by the witness as likely to have committed the crime regardless of the witness’s memory for the perpetrator’s face or other identifying characteristics); or the availability of more reliable identification procedures. Instead, courts have shifted from analyzing whether the one-on-one show-up affects the reliability of a witness’s identification, to the question of whether law enforcement had a “good reason” to use the one-on-one show-up procedure.
A defendant seeking to challenge the use of a show-up procedure bears the burden to prove by a preponderance of the evidence that the show-up was “so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny [him] due process of law.” Commonwealth v. Austin, 421 Mass. 357, 361 (1995) (emphasis added); Commonwealth v. Odware, 429 Mass. 231, 235 (1999). In Martin, the Supreme Judicial Court quoted Austin with approval, to the effect that “a one-on-one pretrial identification raises no due process concerns unless it is determined to be unnecessarily suggestive. Whether an identification procedure is ‘unnecessarily’ or ‘impermissibly’ suggestive . . . involves inquiry whether good reason exists for the police to use a one-on-one identification procedure.” Martin, 447 Mass, at 279, quoting Austin, 421 Mass, at 361 (emphasis in original). The focus is not whether the resulting identification is sufficiently reliable, but whether the police had “good reason” to use the one-on-one show-up, Commonwealth v. Ama-ral, 81 Mass.App.Ct. 143, 148 (2012) (“In reviewing whether a showup was ‘unnecessarily suggestive,’ the key question is whether police had ‘good reason’ to follow such a procedure”), without looking to the availability of other alternative procedures to second-guess the police decision. Martin, 447 Mass, at 280 (‘The question is whether the police acted permissibly. The answer is not governed by the availability of another approach”).
In evaluating whether the police had “good reason” to use a show-up, courts look to the nature of the crime, concerns for public safely, the need to efficiently investigate a crime immediately afterwards, and the utility of promptly confirming the accuracy of a police lead or the need to head in a different direction. Commonwealth v. Austin, 421 Mass, at 362; Commonwealth v. Coy, 10 Mass.App.Ct. 367, 371 (1980). Thus, one-on-one show-ups “of suspects to eyewitnesses of crimes have been regularly held permissible when conducted by the police promptly after the criminal event.” Commonwealth v. Bowden, 379 Mass. 472,479 (1980) (within two hours of the crime), quoting Commonwealth v. Barnett, 371 Mass. 87, 92 (1976), cert denied, 429 U.S. 1049 (1977) (within one hour of crime); Commonwealth v. Thompson, 427 Mass. 729, 735, cert denied 525 U.S. 1008 (1998) (within one hour of crime).
In this case, I find the process of having Off. Gemme brought to the area of the Middle School by his brother, the Worcester Chief of Police, and his observation of Bethune near the Middle School on the ground in handcuffs, was sufficiently suggestive to raise a question about the reliability of Off. Gemme’s resultant identification. Off Gemme got only a brief look at the suspect’s face behind 3 Acton Street before the individual turned and ran. Off. Gemme was presented with only one black male with a blue shirt as a possible suspect. And Off. Gemme knew at the time he saw Bethune that Bethune had been apprehended in the vicinity of the Middle School only minutes after the breaking and entering at 3 Acton Street. These facts were particularly suggestive in this case, raising the specter that Off. Gemme may have simply identified Bethune as the suspect because of the circumstances—i.e. he was a black male in the vicinity with a blue shirt who was running—rather than because he actually recognized him. Moreover, I find that, in light of the fact that Bethune was being arrested on an outstanding warrant, had the police wished to present Bethune to Off. Gemme in a less suggestive line-up or photo array process, they likely could have done so in relatively short order. These findings, however relevant to the reliability of the identification and availability of other alternatives, are not relevant to whether the use of the show-up identification violates Bethune’s rights to due process.
*264 What is relevant to this analysis is that I also find that the police actions were taken in good faith. I find that the police were actively trying to locate the person that Off. Gemme had seen coming out of 3 Acton Street. After Bethune was apprehended in the area of the Middle School within 10 or 15 minutes of the breaking and entering, Off. Gemme went there with the good reason to see if Off. Pulsifer had the right guy or if the police should continue their search of the area for the suspect. See Amaral, 81 Mass.App.Ct. at 149-49.
Relevant here, too, is that the witness observing Bethune in these suggestive circumstances was a police officer, a general class of witnesses that the courts have recognized may be less susceptible to suggestion. Commonwealth v. Martinez, 67 Mass.App.Ct. 788, 794 (2006). See also, e.g., Commonwealth v. Repoza, 1998 WL 1181669 (Mass.Super. Nov. 6, 1998) (Cowin, J.) (“In this case, the identifying witness was a police officer. Thus, it is reasonable to infer that he was less susceptible to police suggestiveness than a civilian witness”).
I therefore find that the police here had good reason to use the one-on-one show-up procedure involved with Off. Gemme observing Bethune near the Middle School after he was apprehended.
For these reasons, it is ORDERED as follows:
ORDER
Defendant’s Motion to Suppress Evidence (docket #26) is DENIED.
Defendant’s Motion to Suppress Identification (docket #27) is DENIED.

Although at least one of the witnesses claimed that the Middle School was in session at the time, it appears this incident occurred during the week of April school vacation for the Worcester Public Schools. See http://worcesterschools.org/modules/locker/files/ get_group_file.phtml?gid’1022373&fid’8556305 (last viewed May 31, 2013). Although potentially relevant to the officers’ credibility at trial, the question of whether school was or was not in session is not relevant to the court’s decision on the two motions.

here is no evidence that Off. Gemme heard these remarks.

Although it is reasonable to suspect that there may have been communication over a police radio in the Chief of Police’s car in which Off. Gemme was traveling to the effect that the person apprehended by Off. Pulsifer was wanted on a warrant for another breaking and entering offense, there was no evidence that Off. Gemme knew at the time he identified Bethune in this show-up identification that Bethune was facing a different breaking and entering charge.

Off. Gemme attempted to stop the suspect as he chased the suspect in the vicinity of Acton Street and Rice Square. See, e.g., Commonwealth v. DaSilva, 56 Mass.App.Ct. 220, 223 (2002); Commonwealth v. Mock, 54 Mass.App.Ct. 276, 277-79 (2002) (police officer exited cruiser and commanded defendant to stop); Commonwealth v. Grinkley, 44 Mass. App. Ct. 62, 74 (1997) (police yelling to youths to remain in place). Cf. Commonwealth v. Perry, 62 Mass.App.Ct. 500, 503 (2004).The suspect did notstop. Off. Gemme by that time had made a personal observation of the suspect coming out of the back of 3 Acton Street where the burglar alarm had just sounded. He had probable cause to believe that the suspect had just committed a breaking and entering into 3 Acton Street. A warrant is not required to arrest a person who commits an offense in a police officer’s presence, Virginia v. Moore, 553 U.S. 164, 178 (2008), or if the police have probable cause to believe the person committed an offense and the arrest occurs in a public place. United States v. Watson, 423 U.S. 411, 418 n.6 (1976).