COMMONWEALTH *vs.* THOMAS K. GOEWEY.

No. 06-P-1204.

Berkshire. April 12, 2007. - June 25, 2007.

Present: VUONO, SMITH, & MEADE, JJ.

Further appellate review granted, 450 Mass. 1104 (2007).

*Controlled Substances. Search and Seizure,* Protective frisk.

A District Court judge erred in allowing a criminal defendant's motion to suppress evidence of marijuana that a State trooper found on the defendant's person, where the trooper articulated a reasonable belief that his safety or the public's safety was in danger when he ordered the defendant to leave the car in which he was riding as a passenger and pat frisked him, i.e., the defendant's production of a possibly false license, his nervous behavior and shaking hands, and his movements within the car. [432-437]

COMPLAINTS received and sworn to in the Southern Berkshire Division of the District Court Department on March 3, 2004.

A pretrial motion to suppress evidence was heard by *Fredric D. Rutberg*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Roderick L. Ireland*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Joseph A. Pieropan*, Assistant District Attorney, for the Commonwealth.

MEADE, J. The defendant was charged by complaint in District Court with possession of a class D controlled substance with intent to distribute in violation of G. L. c. 94C, § 32C(*a*), and for not wearing a seatbelt in violation of G. L. c. 90, § 13A. Prior to trial, the defendant moved to suppress the marijuana that was found concealed on his person during a traffic stop. After conducting an evidentiary hearing, the motion judge issued findings and an order that allowed the motion to suppress. A single justice of the Supreme Judicial Court allowed the Commonwealth's ap-

plication for leave to pursue an interlocutory appeal and reported the matter to this court. See G. L. c. 278, § 28E; Mass.R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501 (1996). This appeal presents the question whether a State trooper articulated a reasonable belief that his safety or the public's safety was in danger when he ordered the defendant to leave a car in which he was riding as a passenger and pat frisked the defendant. The motion judge determined that the exit order and patfrisk were unjustified and suppressed the marijuana. We reverse.

1. *The suppression hearing.* We recite the facts taken from the judge's findings, supplemented by uncontroverted testimony of the only two witnesses at the suppression hearing, State police Trooper Brendan O'Neill and State police Sergeant George Hamilton.[1] See *Commonwealth* v. *Alvarado,* 423 Mass. 266, 268 n.2 (1996). On February 27, 2004, at approximately 5:45 P.M., when it was becoming dark, O'Neill observed a four-door sedan displaying an invalid inspection sticker operating on Green River Road in Alford. O'Neill stopped the vehicle and parked his cruiser behind it. As O'Neill approached the vehicle, he noticed that none of the four occupants had secured themselves with seatbelts. In order to issue citations for the seatbelt violations, O'Neill requested each occupant to provide him with identification. The driver's license provided by the defendant, who was the right rear passenger, had expired two years prior, and the photograph it contained did not resemble the defendant.[2]

While O'Neill was examining the licenses at his cruiser, Hamilton arrived at the scene and offered to assist. O'Neill gave Hamilton the defendant's license and explained that he thought it was possibly false because it did not appear to depict the defendant. O'Neill asked Hamilton to investigate the license while he wrote the citations for the seatbelt violations. While the troopers had this conversation, the defendant turned around four to six times in his seat to look at the troopers behind him.

---

[1] The motion judge did not base his suppression order on any matter related to witness credibility.

[2] The license bore the defendant's name and pictured an individual with long bushy hair and no facial hair. However, the defendant, as seen in the vehicle, presented as having short hair, a piercing in his chin, and facial hair.

At this point, Hamilton told O'Neill he was going to question the defendant about his identity.

When Hamilton reached the car and asked the defendant if he was the individual pictured on the license, the defendant replied that it was his license. When asked why his license was no longer current, the defendant hesitated and then stammered nervously that he no longer drove. Hamilton asked the defendant if he had any other forms of identification such as a supermarket card or a Social Security card. As the defendant leafed through his wallet, Hamilton could see the defendant's hands shaking. The defendant was unable to produce any other identification, and Hamilton returned to O'Neill's cruiser.

As soon as Hamilton reached the cruiser, which was fifteen to twenty feet away, he again saw the defendant looking back at him, quickly turning away, and moving his head down. To Hamilton, it then appeared that the defendant reached either into a coat, around his body, or down below the seat.[3] The defendant's hands were out of Hamilton's sight. Based on the totality of what he had observed up until this point, and his continuing progression of uncertainty as to the defendant, Hamilton feared for his safety. Due to that fear, he told O'Neill that he (Hamilton) was going to have the defendant get out of the car.

When Hamilton returned to the car, the defendant was smoking a cigarette. Upon request, the defendant extinguished it and stepped out of the car. Once outside the car, Hamilton pat frisked the defendant for weapons. In the course of the patfrisk, he asked the defendant if there was anything with which he (Hamilton) should be concerned. The defendant said, "no, just some marijuana." The marijuana was taped to his right calf, concealed under the defendant's pant leg. Hamilton continued the patfrisk of the remainder of the defendant's person. No weapons were discovered. Hamilton did not search the other occupants of the vehicle, as they had exhibited neither furtive movements nor any of the behavior he witnessed in the defendant.

2. *The judge's findings.* The motion judge determined that the initial stop of the car was justified. According to the judge, the

[3]When he previously stood outside the car and spoke to the defendant, Hamilton had seen at least one backpack and some coats in the car.

propriety of the search turned on whether the defendant's behavior, taken in its totality, equaled furtive movements that would have given Hamilton reasonable suspicion to conduct the patfrisk. The judge discounted as a factor any information related to the defendant's expired license because, as a passenger, he was not required to carry identification.

The judge characterized Hamilton's articulated basis for the fear for his safety as merely a "hunch," which did not "reach the constitutional threshold of reasonable suspicion." To the extent any of the defendant's movements may have served as a basis for Hamilton's fear for his safety, the judge determined that Hamilton's fear should have been allayed when he saw the defendant smoking a cigarette. The judge found it "clear[]" that the defendant's movements inside the car were for the purpose of retrieving and lighting a cigarette. In light of these findings, the judge found that at the time Hamilton "seized" the defendant, Hamilton "lacked the requisite suspicion" to justify his action, and the judge allowed the motion to suppress.

3. *Discussion.* "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), quoting from *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002). Here, the propriety of the traffic stop, itself, is not in dispute as the car in question did not have a valid inspection sticker. See *Commonwealth* v. *Pacheco,* 51 Mass. App. Ct. 736, 739 (2001) (invalid inspection sticker justified motor vehicle stop); G. L. c. 90C, § 3(*A*)(1) (police officer who observes occurrence of civil motor vehicle infraction may issue written citation). The only issue presented to the motion judge was whether the exit order and the related patfrisk were appropriate.

Under art. 14 of the Massachusetts Declaration of Rights, the touchstone of our analysis of police conduct that results in a search or seizure is whether that conduct was reasonable. See *Commonwealth* v. *Anderson,* 406 Mass. 343, 346 (1989). The reasonableness of the particular conduct at issue here is controlled by *Commonwealth* v. *Gonsalves,* 429 Mass. 658 (1999), where the Supreme Judicial Court determined that "art. 14 requires that

a police officer, in a routine traffic stop, must have a reasonable belief that the officer's safety, or the safety of others, is in danger before ordering a driver out of a motor vehicle." *Id.* at 662-663.[4] See *Commonwealth* v. *Torres*, 433 Mass. 669, 673, 675-676 (2001) (also noting that this standard applies to both patfrisks and exit orders). Stressing the leniency of this test, the court emphasized that "it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns." *Gonsalves, supra* at 664.

Estimating the reasonableness of the officer's belief is done objectively by asking "whether a reasonably prudent man in the policeman's position would be warranted" in the belief that he or the public was in danger. *Torres, supra* at 673. See *Commonwealth* v. *Vazquez*, 426 Mass. 99, 102-103 (1997). Reasonableness, however, is not measured by whether the Commonwealth is able to make a specific showing that the occupant in question is armed and dangerous. *Commonwealth* v. *Stampley*, 437 Mass. 323, 326 (2002). "Rather, the officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car." *Gonsalves, supra* at 665, quoting from *State* v. *Smith*, 134 N.J. 599, 618 (1994). Therefore, we must "determine whether there were facts and circumstances in the course of this particular traffic stop that, viewed objectively, would give rise to 'a heightened awareness of danger' on the part of the trooper, . . . recognizing that law enforcement officials may have little time in which to avert 'the sometimes lethal dangers of routine traffic stops.' " *Stampley, supra,* quoting from *Gonsalves, supra* at 671 (Fried, J., dissenting).

The stop of the car here was due to the invalid inspection sticker. Once stopped, O'Neill could see that none of the vehicle's four occupants was wearing a seatbelt. That fact justi-

---

[4]In *Gonsalves, supra* at 660-668, the Supreme Judicial Court, as a matter of State constitutional law, parted company with the United States Supreme Court's Fourth Amendment jurisprudence in this area. See *Pennsylvania* v. *Mimms*, 434 U.S. 106, 111 (1977) (police may, without specific justification, order driver out of lawfully stopped vehicle); *Maryland* v. *Wilson*, 519 U.S. 408, 415 (1997) (extending *Mimms* to passengers).

fied his request for identification from the occupants to enable him to write citations for the seatbelt infractions. See *Stampley, supra* at 326. O'Neill's suspicion was initially aroused when the defendant produced an expired license with a seeming lack of identity between the defendant's current appearance and that depicted on the expired license. Because of this, O'Neill requested that Hamilton investigate whether the license was indeed false.

While the troopers discussed the matter, the defendant repeatedly turned around in the backseat to look at the troopers. When Hamilton went to the car and questioned the defendant about his identity and license status, the defendant acted nervous and stammered his responses. While he unsuccessfully searched his wallet for any corroborating identification, the defendant's hands were shaking. But this additional conduct did not generate the exit order.

When Hamilton returned to O'Neill's cruiser, which was parked behind the car, the defendant again looked back at the troopers and then quickly turned away. At that point, Hamilton saw the defendant reach down under the seat, around his body, or into a coat. Hamilton could not see his hands. Based on everything he had seen to this point, Hamilton feared for his safety and decided to order the defendant out of the car. When Hamilton reached the car, he could see the defendant smoking a cigarette. Hamilton then told the defendant to step out of the car. Although the ensuing patfrisk resulted in the discovery of marijuana, Hamilton continued the search of the defendant's whole person to make sure he was not armed.

In suppressing the marijuana, the judge found that the defendant's possession of an expired license with a photograph that did not then resemble the defendant added nothing to the analysis. We disagree. By itself, it would not justify an exit order for a passenger — and here it was not so employed — but it did serve as the beginning of a chain of articulated circumstances that gave rise to Hamilton's suspicion. Because the troopers were justified in investigating the defendant's identity to write a proper citation, the status of the defendant's license also contributes to the conclusion that the duration of the stop did not exceed its purpose. See *Commonwealth* v. *Williams,* 422 Mass. 111, 116

(1996) (scope of lawful seizure must be justified by and proportionate to situation).

The judge determined that Hamilton's articulated basis for his fear for his safety, i.e., the defendant's production of a possibly false license, his nervous behavior, his shaking hands, his repeated turning around to look at the troopers, and his bending down to reach under the seat or into a coat, was merely a "hunch" that did not justify the exit order. We disagree. When reviewing in hindsight the circumstances attending a lawful traffic stop, "we think it crucial to remember that, as shown by many tragic climaxes to threshold police inquires, 'the answer might be a bullet.' " *Commonwealth* v. *Silva*, 366 Mass. 402, 407 (1974), quoting from *Terry* v. *Ohio*, 392 U.S. 1, 33 (1968) (Harlan, J., concurring). Indeed, the same or similar conduct witnessed here by Hamilton has, on countless occasions, fully justified a police officer's exit order. See *Stampley*, 437 Mass. at 327 & n.3, and cases cited. See also *Commonwealth* v. *Horton*, 63 Mass. App. Ct. 571, 575 (2005) (rear seat passenger raised and lowered his hands and kicked something under seat); *Commonwealth* v. *Ancrum*, 65 Mass. App. Ct. 647, 655 (2006) (passengers looked out rear window and ducked down). See generally Smith, Criminal Practice and Procedure § 278 (2d ed. 1983 & Supp. 2006).

The judge further determined that even if the defendant's movements could have served as a basis for the fear Hamilton articulated, his fear should have been allayed when he saw the defendant smoking a cigarette. For the judge, it was "clear" that the purpose of the defendant's movements was to retrieve the cigarette. However, that analysis is flawed. "The justification for an exit order does not depend on the presence of an 'immediate threat' at the precise moment of the order, but rather on the safety concerns raised by the entire circumstances of the encounter." *Stampley, supra* at 328. Even though one could conclude that any concerns about Hamilton's safety had dissipated when he was presented with a possible explanation for the defendant's furtive movements, one could also conclude that the defendant had retrieved a weapon along with the cigarette. See *id.* at 329. We do not share the judge's confidence on the clarity of purpose for these rapidly unfolding events. But

more importantly, Hamilton was not required to bet his life on an assessment of the probabilities of each possible explanation. See *Terry*, 392 U.S. at 23 ("Certainly it would be unreasonable to require that police officers take unreasonable risks in the performance of their duties").[5]

Finally, it bears mentioning why an exclusionary rule has been judicially engrafted onto art. 14. See *Commonwealth* v. *Ford*, 394 Mass. 421, 426 (1985) (creating art. 14's exclusionary rule). See generally Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 1-4 (2006). Generally, of course, such a rule is necessary to give art. 14 practical meaning and purpose beyond being simply rhetorical or precatory. More specifically, the foundation of the exclusionary rule is to provide a prophylactic remedy against, and to deter, unlawful police conduct.[6] *Commonwealth* v. *Wilkerson*, 436 Mass. 137, 142 (2002). The rule should not be otherwise applied.

Here Hamilton strictly followed the requirements of art. 14 in this area of our search and seizure law. At each step of the encounter he acted with a measured response as his concern for his safety gradually escalated. See *Stampley*, 437 Mass. at 330. The basis for his stated concerns were specifically articulated; he did not act hastily based merely on a hunch. See *ibid*. His decision to proceed with caution and to thereby order the defendant out of the car was reasonable and fully satisfies the lenient standard set forth in *Gonsalves*, 429 Mass. at 664. Because Hamilton did nothing wrong, "there is no unlawful conduct for exclusion of the evidence to deter." *Wilkerson*,

---

[5]In 2004 alone, the year of the stop in this case, 6,568 police officers were assaulted and six were killed during traffic pursuits and stops in the United States. Federal Bureau of Investigation, U.S. Dept. of Justice, Law Enforcement Officers Killed & Assaulted, 2004, tables 20 & 67 (2005). During the ten-year period from 1995 through 2004, ninety-six officers were killed in the same circumstances. *Id.* at table 20.

[6]To a lesser extent, the rule has been justified as a means to protect "judicial integrity," i.e., courts should not assist in the wilful disobedience of the constitution. See *Elkins* v. *United States*, 364 U.S. 206, 222-223 (1960). But that principle has not been warmly received except in noncriminal proceedings. See *Selectmen of Framingham* v. *Municipal Ct. of Boston*, 373 Mass. 783, 787 (1977); *Ford, supra* at 434-435 (Lynch, J., dissenting). See also *Commonwealth* v. *Sheppard*, 387 Mass. 488, 502 (1982), rev'd on other grounds, 468 U.S. 981 (1984) ("judicial integrity fails as a substantial, independent support for the [exclusionary] rule").

*supra.* Cf. *Commonwealth* v. *Lahti*, 398 Mass. 829, 835 (1986), cert. denied, 481 U.S. 1017 (1987). Moreover, because an improper application of the exclusionary rule exacts an unwarranted and costly toll on the truth-finding function in criminal trials, see *Commonwealth* v. *Sheppard*, 387 Mass. 488, 503 (1982), rev'd on other grounds, 468 U.S. 981 (1984), quoting from *United States* v. *Payner*, 447 U.S. 727, 734 (1980), the suppression order must be reversed.

4. *Conclusion.* The order allowing the defendant's motion to suppress is reversed, and the matter is remanded to the District Court for further proceedings consistent with this opinion.[7]

*So ordered.*

---

[7]The defendant did not file a brief in this case. We have reviewed the entire record before the motion judge and conclude that there is no ground to support the suppression order. The defendant was, therefore, not deprived of any ground of defense at this stage. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).