COMMONWEALTH *vs.* KEON MONTEIRO.

No. 06-P-1923.

Suffolk. April 5, 2007. - March 31, 2008.

Present: RAPOZA, C.J., LENK, MILLS, GRAINGER, & MEADE, JJ.

*Firearms. Constitutional Law,* Search and seizure. *Practice, Criminal,* Motion to suppress. *Search and Seizure,* Threshold police inquiry. *Threshold Police Inquiry.*

A trial court judge erred in granting a criminal defendant's motion to suppress physical evidence (a firearm) discarded by the defendant while running from the police, where the defendant's nervous and evasive behavior at the time he discarded the firearm — behavior that was not preceded by any inappropriate police action — gave rise to a reasonable suspicion of criminal activity sufficient to justify a stop by police. [478-480] MILLS, J., dissenting, with whom LENK, J., joined.

COMPLAINT received and sworn to in the Central Division of the Boston Municipal Court Department on August 9, 2006.

A pretrial motion to suppress evidence was heard by *Raymond G. Dougan, Jr.,* J.

*John P. Zanini,* Assistant District Attorney (*Michael J. Callahan,* Assistant District Attorney, with him) for the Commonwealth.

*Scott D. Bradley* for the defendant.

GRAINGER, J. The precise point at which an encounter between the police and the public "constitutes an intrusion of constitutional dimensions requiring justification," *Commonwealth* v. *Stoute,* 422 Mass. 782, 789 (1996), continues to challenge courts, law enforcement officials, and defense counsel as the factual circumstances underlying cases raised on appeal remain as varied as human conduct itself. Here, the Commonwealth appeals the allowance of the defendant's motion to suppress physical evidence, a firearm, discarded by the running defendant under conditions which we recount in full.

*Factual background.* Following a hearing on the motion to

suppress, the judge found as follows. During a conversation between Boston police Officers Cogavin, Cooley, and Tarrantino[1] and four males known to the officers for gun-related incidents, Cooley saw one of the males look at the defendant (who was nearby on a bicycle), "make some sort of hand gesture to [the defendant] and then walk away from [the defendant], the three other males and the police. Cooley saw [the defendant] turn around and [pedal] his bike away from the four males and [the] three plain-clothed police officers."

"The three police officers entered their unmarked police car without [activating] lights or a siren and followed [the defendant], who was riding his bike. The driver pulled the unmarked cruiser beside [the defendant] and Cooley said[,] 'What's up, can we talk to you?' [The defendant] had a panicked look. The officers had no information from any source supporting a conclusion that [the defendant] had committed a crime, was committing a crime or was about to commit a crime." The defendant sped up and pedaled ahead of the cruiser. He then "dropped his bike and started to run. The officers jumped out of the cruiser and ran after him." As he ran after the defendant, Tarrantino "saw [the defendant] pulling at his waist band and then saw what looked like the handle of a gun. Tarrantino called out to his partners[,] 'He's got a gun,' and continued running after [the defendant]. He saw [the defendant] throw the gun onto a roof. Cooley caught [the defendant], took him to the ground at which point he was handcuffed. A gun was found on the roof where [the defendant] had thrown it."[2]

*Discussion.* The judge's order assumes that the police had no justification to stop the defendant at the time he discarded his firearm. The Commonwealth asserts as alternative grounds for error that no seizure had occurred at the time the defendant

---

[1]We note that Officer Tarrantino's name is also spelled "Tarantino" in the judge's memorandum of decision. Without knowing which version is correct, we use "Tarrantino" throughout this opinion.

[2]The judge specifically found all other testimony "not credited." The Commonwealth failed to include any transcripts or other evidence in the record on appeal; we therefore do not consider any possible challenge to the adequacy of evidence to support the judge's findings, and note that the failure to provide a transcript makes more difficult the type of fully comprehensive overview on which appellate review is properly based.

discarded his gun in public or that, if a seizure occurred, it was justified. We conclude that this case is governed by the recent Supreme Judicial Court decision in *Commonwealth* v. *Sykes*, 449 Mass. 308 (2007), and, accordingly, reverse the suppression of the firearm. Here, as in *Sykes*, no stop in the constitutional sense occurred before the defendant abandoned his bicycle and began to run. By that time the police possessed a reasonable suspicion of criminal activity sufficient to justify a stop.

It is difficult to distinguish *Sykes* in any material respect from the sparse record here presented on appeal. The facts in *Sykes* are as follows: there, the defendant, on a bicycle, observed plain-clothed police officers, pedaled away with some backward looks at the officers, increased his speed to pull ahead of the unmarked cruiser when the police pulled alongside and asked to talk with him, collided with a tree, abandoned his bicycle, began running while "clenching his waistband," was followed by police officers on foot, and threw away his gun during the pursuit while under police observation. *Id.* at 309-310. The factors selected by the dissent to distinguish *Sykes* from the instant case do not appear to create a material difference. Specifically, the officers' response in *Sykes* to a 911 call regarding alleged drug activity in a high crime area is the functional equivalent in this case of the officers' questioning of four individuals known for criminal activity involving firearms. The defendant's "panicked look" in this case is somewhat more suggestive than the unspecified backward looks the defendant in *Sykes* made to the officers behind him. The defendant in *Sykes* "clench[ed] his waistband" earlier in the chain of events than the defendant in this case was observed "pulling at his waist band"; that does not constitute a distinction of legal import in determining whether either defendant had demonstrated behavior sufficient to justify a threshold inquiry. In both cases, "[t]he fact that the defendant chose to abandon his bicycle in an effort to dodge further contact with the police was significant." *Id.* at 315. We also note additional factors, not present in *Sykes*, that justified the police in considering the defendant's behavior in this case to be suspicious, namely, his movement away from the group after receiving a hand gesture from one of the males known to the police for gun-related incidents, and the fact that his abandonment of his bicycle was wholly

intentional, rather than precipitated by an accident. As in *Sykes*, by the time the defendant abandoned his bicycle, the police possessed reasonable suspicion of criminal activity sufficient to justify a stop.

As the United States Supreme Court has noted, "nervous evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois* v. *Wardlow*, 528 U.S. 119, 124 (2000). See *Commonwealth* v. *Sanchez*, 403 Mass. 640, 645-646 (1988) ("the defendant broke away from the police before they pursued him, thus providing the police with a reasonable and articulable suspicion"); *Commonwealth* v. *Sweezey*, 50 Mass. App. Ct. 48, 52 (2000) (defendant's flight after valid stop by officers elevated officers' reasonable suspicion of criminal activity); *Commonwealth* v. *Wilson*, 52 Mass. App. Ct. 411, 415 (2001), quoting from *Commonwealth* v. *Marrero*, 33 Mass. App. Ct. 440, 443 (1992) (flight a relevant factor where it has not been triggered by inappropriate police action).[3]

In the instant case, the defendant's flight was not preceded "by any inappropriate police action," *Commonwealth* v. *Marrero*, *supra* at 443, and it occurred before any "inquiry of the defendant . . . or pursuit of him personally was attempted." *Commonwealth* v. *Wilson*, *supra* at 415. "The flight could therefore be considered in determining whether reasonable suspicion existed when the police began to chase the defendant." *Ibid.* Accordingly, "[w]e conclude that all of the defendant's actions, taken together, were sufficient to give rise to reasonable suspicion of criminal activity." *Commonwealth* v. *Sykes*, 449 Mass. at 315.

The order allowing the defendant's motion to suppress physical evidence seized and any statements made by the defendant is reversed, and the case is remanded for further proceedings.

*So ordered.*

MILLS, J. (dissenting, with whom Lenk, J., joins). *Com-*

---

[3]We find the dissent's conjecture that the defendant was unaware of the presence of any police when he commenced his evasive behavior to be unpersuasive; in any event, the defendant's state of mind is not relevant to whether his conduct, viewed objectively by the police, gave rise to reasonable suspicion.

*monwealth* v. *Sykes*, 449 Mass. 308 (2007), was acknowledged to be a "close case" on its considerably more compelling facts. *Id.* at 314. The majority in my view misconstrues the very limited factual record that is before us, fails to accord significance to the many respects in which this case differs from *Sykes*, and misapplies the teachings of *Sykes*. Accordingly, I respectfully dissent.

Facts matter, perhaps nowhere more than in situations involving the suppression of evidence recovered by police following what is said to have been an unlawful seizure. Determining whether and when a seizure occurred is critical, for a seizure is an intrusion of constitutional dimensions that the Commonwealth must justify. *Id.* at 310-311. See *Commonwealth* v. *Thinh Van Cao*, 419 Mass. 383, 387, cert. denied, 515 U.S. 1146 (1995). The motion judge here made succinct findings of fact, reproduced in their entirety below,[1] after concluding an evidentiary suppression hearing at which the Commonwealth bore the burden of proof. See *Commonwealth* v. *DePeiza*, 449 Mass. 367, 369

---

[1]*"FINDINGS OF FACT*

"On May 28, 2006, boston [*sic*] police officers Cogavin, Cooley and Tarantino observed a black male on a bike crossing *over* Morton to Wildwood Street. At that time, the officers were talking with four males known to them for 'firearm related incidents.' The man on the bike, [the defendant], was not the subject of any discussion with the four males. Cooley saw one of the males they were talking to look at [the defendant] and make some sort of hand gesture to [the defendant] and then walk away from [the defendant], the three other males and the police. Cooley saw [the defendant] turn around and peddle [*sic*] his bike away from the four males and three plain-clothed police officers.

"The three police officers entered their unmarked police car without lights or a siren and followed [the defendant], who was riding his bike. The driver pulled the unmarked cruiser beside [the defendant] and Cooley said 'What's up, can we talk to you?' [The defendant] had a panicked look. The officers had no information from any source supporting a conclusion that [the defendant] had committed a crime, was committing a crime or was about to commit a crime. [The defendant] got ahead of the cruiser. At that point, [the defendant] dropped his bike and started to run. The officers jumped out of the cruiser and ran after him. Tarrantino as he ran after [the defendant] saw [the defendant] pulling at his waist band and then saw what looked like the handle of a gun. Tarrantino called out to his partners 'He's got a gun,' and continued running after [the defendant]. He saw [the defendant] throw the gun onto a roof. Cooley caught [the defendant], took him to the ground at

(2007). We know that those findings reflect all that the judge found believable because he stated in no uncertain terms that "any other testimony is specifically not credited by the court."

The Commonwealth as appellant, for reasons best known to itself, has not provided a transcript of the hearing. See Mass. R.A.P. 8, as amended, 430 Mass. 1601 (1999). The Commonwealth accordingly cannot contend that any of the judge's findings of fact are erroneous, and we must accept them in their entirety, reviewing independently only the "correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting from *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996). Because the transcript has not been provided, we may not supplement the judge's findings with uncontested evidence from the motion hearing.[2] Compare *Commonwealth* v. *Costa*, 448 Mass. 510, 512 n.3 (2007); *Commonwealth* v. *Correia*, 66 Mass. App. Ct. 174, 175-176 (2006), citing *Commonwealth* v. *Kitchings*, 40 Mass. App. Ct. 591, 593 n.4 (1996). In these circumstances, I see no reason to construe the facts found by the judge in the light most favorable to the Commonwealth, as the majority appears to do. That being said, I turn to the aspects of the majority's analysis that I think are mistaken.

which point he was handcuffed. A gun was found on the roof where [the defendant] had thrown it."

[2]"Appellate courts may supplement a judge's finding of facts if the evidence is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony. *Commonwealth* v. *Alvarado*, 423 Mass. 266, 268 n.2 (1996). *Commonwealth* v. *Santiago*, 410 Mass. 737, 738 n.2 (1991). See *Commonwealth* v. *Butler*, 423 Mass. 517, 526 n.10 (1996) (appellate court considers uncontroverted testimony that 'in no way contradict[s] the motion judge's findings [but] merely fill[s] out the narrative'); *Commonwealth* v. *Scott*, 52 Mass. App. Ct. 486, 492 (2001), *S.C.*, 57 Mass. App. Ct. 36 (2003) and 440 Mass. 642 (2004) (court's willingness to supplement motion judge's findings based on confidence that material 'is indeed uncontroverted' and that motion judge 'explicitly or implicitly credited the witness's testimony'). In addition, '[o]n a motion to suppress, "[t]he determination of the weight and credibility of the testimony is the function and responsibility of the [motion] judge who saw the witnesses, and not this court." ' *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980)."

*Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007).

1. *When did the seizure occur?* The court in *Sykes* instructs that "[d]etermining the precise moment at which a seizure occurs is critical to resolving the issue of suppression." *Commonwealth* v. *Sykes*, 449 Mass. at 310. The judge here found that the police, who had been following the defendant in their unmarked car as he rode his bicycle, "jumped out of the cruiser and ran after him" when he dropped his bicycle and started to run. *Sykes* quite plainly instructs that "for constitutional purposes [the defendant's seizure] occurred when the officers left their cruiser and *began* to chase the defendant" (emphasis added). *Id.* at 314. In this case, the defendant discarded his gun well after the chase began, i.e., after he was seized, for constitutional purposes. The "precise moment" in this case is the same as in *Sykes*. The majority's analysis fails to specify the moment of seizure. They focus instead both on the "time [the defendant] discarded his firearm" and on the defendant's actions ("no stop in the constitutional sense occurred before the defendant abandoned his bicycle and began to run"), rather than on the action of the police. This lack of specificity and misplaced focus are not helpful to a simple *Sykes* analysis, tending instead to blur the facts that distinguish this case from *Sykes*.

2. *Justification for the seizure.* On the issue of reasonable and articulable suspicion to validate the defendant's seizure, the majority contends that reversal is required by *Sykes*, asserting that the facts in *Sykes* are indistinguishable in any material respect from the facts as they discern them here. I disagree. On the facts that the judge found, *Sykes* requires suppression of the evidence.

In *Commonwealth* v. *Sykes*, 449 Mass. at 309, the police officers observed the defendant in a high crime area as he was separating himself from a group of black and Hispanic males who had been reported to the police as engaging in drug activity.[3] In stark contrast, in this case, there are no facts of record and no findings that the defendant was connected to criminal activity, that he was part of a group so engaged, or even that he was

---

[3]In *Commonwealth* v. *Sykes*, 449 Mass. at 309, the police received the report of current, ongoing criminal activity by way of a 911 telephone call. The factual narrative suggests that the police in *Sykes* responded with reasonable dispatch to the location of the alleged drug crimes where the defendant in that case was first observed.

in a high crime area. Indeed, the judge found that the three "officers were talking with four males known to them for 'firearm related incidents' " and that the defendant, "a black male on a bike," "was not the subject of any discussion with the four males" before one of the four males "ma[d]e some sort of hand gesture" to the defendant and the defendant rode away on his bicycle. The record is silent as to the defendant's relationship, if any, with the four males. The otherwise undescribed "some sort of hand gesture" suggests that one of the four knew the defendant. That man walked away from police and the other three men who were speaking with the police, after he gestured to the defendant. The defendant turned around and bicycled away from the remaining group. We know no more than this, and will not read into it, as the majority does, anything more than that one man did not join the group, and that one man left it. We do not know why.

The majority's recitation that the officers in this case were "questioning . . . four individuals known for *criminal* activity involving firearms" (emphasis added) amounts to appellate fact-finding because nothing in the record supports any such "criminal activity."

In *Commonwealth* v. *Sykes*, 449 Mass. at 309, the police officers, even though in plain clothes, wore shirts "emblazoned with the words 'Boston Police Department Anti-Crime Unit,' and all four officers were displaying their badges outside of their clothes." Hence, it was reasonable to infer that the defendant in *Sykes*, who looked at his pursuers several times as he rode away, knew that the individuals who were surveilling him and asking to speak with him were police officers and, therefore, that his subsequent actions were taken for the purpose of avoiding the police.[4] Here, there is no finding that the defendant looked back at his pursuers as he rode away. Rather, there is a finding that, when the pursuers pulled up next to him and said, "What's up, can we talk to you," he had a panicked look.

[4] The court in *Sykes* noted as significant the fact that the defendant "made an effort to dodge further contact with the *police*," *Commonwealth* v. *Sykes*, 449 Mass. at 315 (emphasis added), relying on *Commonwealth* v. *Grandison*, 433 Mass. 135, 139-140 (2001), and *Commonwealth* v. *Doocey*, 56 Mass. App. Ct. 550, 555-556 (2002), for the proposition that evasive behavior during a *police* encounter is one factor establishing reasonable suspicion.

There is no finding that he knew that his pursuers were police officers. The judge found that the officers were "plain-clothed" and in an "unmarked" car. Nothing in the findings tells us anything more about the police officers or their appearance. There is, therefore, no basis for concluding as the majority does that the defendant was attempting to avoid contact with the police. The judge, of course, made no such finding. In my view the majority's reasoning, which is based upon an impermissible inference that the defendant knew that his pursuers were police officers, is flawed.[5]

Finally, in *Sykes*, the defendant was observed clenching his waistband prior to the seizure, i.e., when the four police officers left their vehicle and began the chase. However, in this case, the officers jumped out of the cruiser and began their chase before Officer Tarrantino saw the defendant pulling at his waistband and then observed what looked like the handle of a gun.[6] It is impermissible to use Officer Tarrantino's postseizure observation of the defendant clutching his waistband in order to justify a seizure that had already occurred without the benefit of that observation. See *Commonwealth* v. *Scott*, 52 Mass. App. Ct. 486, 492-496 (2001).

The court in *Commonwealth* v. *Sykes*, 449 Mass. at 314, acknowledged that, even on its facts, it was a close case. In my view this case, on the facts found by the judge, is clearly on the other side of the line. I would accordingly affirm the judge's grant of the defendant's motion to suppress.

---

[5]Indeed, the police in this case were in plain clothes, using an unmarked car, avoiding lights and sirens, and obviously acting to obscure their identity as police pursuers.

[6]The police observation of the defendant in *Sykes* "clenching" his waistband, prior to his seizure, and the police observation of the defendant in this case "pulling at his waist band" after the seizure are critical observations in the analysis of reasonable suspicion. See *Commonwealth* v. *DePeiza*, 449 Mass. at 368-374 (defendant walking with "straight arm" gait and concealing something from police can contribute to reasonable suspicion).