NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-403                                          Appeals Court

COMMONWEALTH vs. DEQUAN MARTIN.

No. 15-P-403.

Suffolk.    April 1, 2016. - July 6, 2017.

Present: Meade, Wolohojian, & Maldonado, JJ.


Marijuana. Practice, Criminal, Motion to suppress. Threshold
     Police Inquiry. Probable Cause. Search and Seizure,
     Threshold police inquiry, Exigent circumstances, Probable
     cause, Pursuit, Emergency. Constitutional Law, Search and
     seizure, Investigatory stop, Probable cause.


     Complaint received and sworn to in the Dorchester Division
of the Boston Municipal Court Department on April 12, 2012.

     After transfer to the Central Division of the Boston
Municipal Court Department, a pretrial motion to suppress
evidence was heard by Michael J. Coyne, J., and the case was
heard by Thomas C. Horgan, J.


     Chase A. Marshall for the defendant.
     Kathryn Leary, Assistant District Attorney, for the
Commonwealth.


     MALDONADO, J. In this case, we consider whether the

warrantless entry by police into a residence was justified where

the entry was made while chasing the defendant, who fled from

police during a stop for a civil infraction of marijuana possession.  Concluding that these circumstances do not give rise to any exigency that would authorize the police to follow the defendant into a residence, we reverse.

Background.  On April 11, 2012, at about 8:50 P.M., two undercover Boston police officers, while patrolling the Dorchester section of Boston, approached a legally parked vehicle in which sat three males.  The vehicle was "consumed with smoke" and condensation had formed on the rear windshield. The defendant was seated in the front passenger seat.  As the officers approached the vehicle, the defendant opened the door and stepped outside.  Smoke emanated from the vehicle, and the officers were struck by a "strong" odor of burnt marijuana.

One of the officers, Officer Beliveau, who had experience and training in drug related crimes, was approaching the passenger side and ordered the defendant to get back inside the vehicle.  The defendant sat back in the front passenger seat but his legs protruded outside the vehicle through the door. Beliveau repeated his command, and the defendant repositioned himself fully into the vehicle.  "[I]n the passenger compartment of that door," Beliveau then observed a small plastic glassine bag, a copper grinder (commonly used to break up marijuana so that it could be more easily rolled into cigarettes), and cigar

wrappers.  "[G]reen leafy matter" was observed inside the grinder.

The defendant appeared very nervous.  He told Beliveau, who was standing before him, that he felt nauseous and wanted to throw up; he asked the officer to step aside to make room for him to vomit.  Beliveau jokingly quipped that he must have smoked some "bad weed," but he did not move away.  Beliveau, instead, leaned into the vehicle and addressed the back seat passenger (passenger).

Beliveau asked the passenger and the defendant for identification.  The passenger produced identification, but he was also asked by Beliveau if he had ever been arrested or on probation.  The passenger responded that he had been arrested for a firearm charge and was on probation.  The defendant responded that he did not have any identification on him, but he disclosed his name and date of birth.  Beliveau jotted that information in his notebook, and likewise asked the defendant several additional questions, including whether he had any warrants, was on probation, or had ever been arrested.  The defendant responded that he had been arrested, but Beliveau could not remember if he disclosed the charge.  At that point, which was approximately four minutes from the time the officers approached the vehicle, Beliveau's partner called for back up.

Meanwhile, a woman started approaching the vehicle and asked the officers what was going on. Beliveau told the woman that they were conducting an investigation that would take only a couple of minutes, and he asked her to step back. The woman complied, and the defendant identified her as his mother.

Within a few minutes, two uniformed officers arrived. One of those officers positioned himself near the defendant. Beliveau handed his notebook to his partner, who began checking the defendant's information in the computer located in the cruiser. Beliveau also went around the vehicle to the driver's side rear door and continued his investigation of the passenger. When Beliveau began pat frisking that individual, which was seven to eight minutes after Beliveau and his partner first approached the vehicle, the defendant fled.

Three officers chased after the defendant, while Beliveau remained at the scene. The officers yelled for the defendant to stop, but he kept running. As the officers chased the defendant, there was a group of people on the sidewalk. The defendant ran approximately forty or fifty feet[1] to a side door of 440 Gallivan Boulevard, which was later determined to be his residence. He entered the residence without the use of force or a key. The officers followed the defendant into the residence;

---

[1] That the testimony was not consistent as to the distance to the residence does not affect the outcome of this case.

there were other individuals in the residence at that time.  The defendant ran through the kitchen and the dining room to the front hallway, where the officers tackled him.  Once on the ground, without giving the defendant any Miranda warnings, one of the officers asked the defendant why he had run.  The defendant responded that "he had a firearm" in his front right pocket.  The police retrieved the gun and handcuffed the defendant.

The defendant was arrested and charged with three firearm related crimes[2] and resisting arrest.  Arguing that the initial stop and the incremental progression of police activity violated his rights under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, the defendant moved to suppress the evidence, including the gun.  The judge denied the motion with the following single endorsement:  "I find the officers had reasonable suspicion to confront the [defendant] and the subsequent actions of the [defendant] provided sufficient probable cause to seize the [defendant]."  Prior to the jury-waived trial, the Commonwealth dismissed two of the charges and the defendant stipulated that he possessed a loaded firearm.  The defendant was found guilty of carrying a firearm without a license and carrying a loaded

---

[2] Carrying a firearm without a license, possession of ammunition without a firearm identification card, and carrying a loaded firearm without a license.

firearm without a license.  The defendant appeals, arguing that his motion to suppress was erroneously denied.  We agree.

Discussion.  1.  The stop.  The parties agree, correctly, that the defendant was stopped in the constitutional sense when Beliveau ordered him back into the vehicle.  See, e.g., Commonwealth v. Borges, 395 Mass. 788, 791 (1985) (a person is "seized" by police if, in view of all of the circumstances surrounding the incident, a reasonable person would not believe that he was free to leave); Commonwealth v. Lyles, 453 Mass. 811, 815 (2009) (same).  The defendant argues that his seizure was based only on the odor of burnt marijuana, which did not give rise to a reasonable belief that he possessed a criminal amount of marijuana.  See Commonwealth v. Cruz, 459 Mass. 459, 469 (2011); Commonwealth v. Rodriguez, 472 Mass. 767, 778 (2015).[3]  As there was no reasonable suspicion of criminal activity, the defendant asserts, the seizure was

---

[3] The court in Rodriguez distinguished between police stopping a motor vehicle for a civil traffic violation, which requires reasonable suspicion, and police stopping a motor vehicle to investigate a civil infraction of possession of marijuana.  The court reasoned that there is "no obvious and direct link" between maintaining road safety and enforcement of civil marijuana possession, which through a ballot initiative was decriminalized.  Rodriguez, supra at 777-778.  The court declined to extend the rule that allows police to stop a vehicle based on reasonable suspicion of a civil motor vehicle offense to stops of a vehicle by police to enforce the civil penalty for possession of one ounce or less of marijuana.  Id. at 778.  See G. L. c. 94C, §§ 32L-32N.  Here, however, the officers approached an already parked vehicle, and there was no concern of a motor vehicle infraction.

unconstitutional and any evidence seized thereafter should have been suppressed.  See Cruz, supra; Rodriguez, supra.  We disagree.

While the defendant correctly asserts that there was no reasonable suspicion for his possession of a criminal amount of marijuana, there was overwhelming evidence of civil marijuana possession.  Compare Rodriguez, supra (where "a police officer actually observed an infraction -- such as a person walking through a park smoking what appeared to be a marijuana cigar or cigarette --" the officer may stop offender to issue citation and confiscate item).  In addition to the odor of burnt marijuana, the officers noticed that the interior of the vehicle, in which the defendant sat, was filled with so much smoke that it was condensing on the rear window.  Also, before the defendant was ordered back into the vehicle, police had observed a plume of smoke that smelled like marijuana escape through the open door.  Those observations, in combination with the officer's experience that such smoke occurs from individuals smoking marijuana, provided probable cause to believe that the individuals occupying the vehicle were presently in the process of consuming marijuana.[4]  Accordingly, the police could lawfully

-----

[4] While it may also be fair to infer that the three occupants were sharing the marijuana, decisional law has made clear that the social sharing of marijuana does not constitute

detain the defendant long enough to issue a citation and confiscate the marijuana. See Cruz, supra at 469 n.16; Commonwealth v. Locke, 89 Mass. App. Ct. 497, 501 (2016).

The defendant's next challenge, that the length and nature of the stop was longer and more intrusive than necessary for the issuance of a civil citation, is arguably a closer question. Once the defendant provided his name and date of birth, Beliveau did not proceed directly to confirm the defendant's identity for issuance of a citation.[5] Rather, Beliveau engaged in a series of unrelated questions pertaining to whether the defendant had a criminal history. The defendant was asked whether he had ever been arrested, had any warrants, or was on probation. Those probing questions into the defendant's criminal history during a stop grounded in only a civil violation for marijuana possession are at odds with the Supreme Judicial Court's directive that such an infraction is "no longer 'a serious infraction worthy of criminal sanction,' and that those who commit this offense should be treated differently from other drug offenders." Rodriguez, supra at 777, quoting from Cruz, 459 Mass. at 471. In addition, those questions, when asked of the passenger,

---

distribution in violation of G. L. c. 94C, § 32C. See Commonwealth v. Pacheco, 464 Mass. 768, 772 (2013).

[5] "The defendant's inability to provide a license was unremarkable," as he was simply a passenger in a parked vehicle and therefore "was not required to carry one." Commonwealth v. Brown, 75 Mass. App. Ct. 528, 536 (2009).

resulted in police calling for back up and a further delay in the civil citation process while awaiting the arrival of additional officers.

However, in this particular case, because the questioning produced no incriminating evidence and was brief (the uniformed officers arrived within minutes of the call), we are not inclined to conclude at this time that it resulted in unreasonable delay. When the defendant fled, only seven to eight minutes had passed from the arrival of Beliveau and his partner, and the police were still in the process of confirming the defendant's identifying information. We conclude, therefore, that the duration of the stop did not exceed the period reasonably necessary to issue the citation. See Commonwealth v. Goewey, 69 Mass. App. Ct. 429, 434 (2007) (extended duration of stopped motor vehicle permissible where officers were investigating defendant's identity in order to write proper citation). See also Commonwealth v. Torres, 424 Mass. 153, 158 (1997); Commonwealth v. Demirtshyan, 87 Mass. App. Ct. 737, 745-746 (2015). We turn next to the chase that led to the warrantless entry into the residence.

2. Exigent circumstances. a. Hot pursuit. "Warrantless entries into the home are prohibited by the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights absent either probable cause and exigent

circumstances, or consent." Commonwealth v. Rogers, 444 Mass. 234, 236 (2005). "A variety of circumstances may give rise to an exigency sufficient to justify a warrantless search, including law enforcement's need to . . . engage in 'hot pursuit' of a fleeing suspect." Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013), citing United States v. Santana, 427 U.S. 38, 42-43 (1976). "This exception effectuates the principle that 'a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place.'" Commonwealth v. Jewett, 471 Mass. 624, 631 (2015), quoting from Santana, supra at 43. The Commonwealth bears the "heavy burden," in the absence of consent, of justifying a warrantless entry by establishing both probable cause and exigent circumstances. Jewett, supra at 628. See Commonwealth v. Tyree, 455 Mass. 676, 684 (2010).

The hot pursuit exception is inapplicable here for several reasons. This exception is based on the limiting principle that the grounds for entering a dwelling in hot pursuit of one fleeing arrest were set in motion in a "public place." Santana, supra at 42-43. Put another way, the grounds for arrest must have been in place prior to the warrantless police entry. The exception is further limited to the capture of "an individual suspected of committing a jailable misdemeanor or felony." Jewett, supra at 632-633. Here, the officers' pursuit of the

defendant commenced with probable cause to issue a citation for civil marijuana possession, which is not a jailable misdemeanor. See G. L. c. 94C, § 32L.

Furthermore, nothing that occurred during the chase supplied probable cause of a more serious offense. The Commonwealth argues that because the officers did not know that the defendant had run into his own home, they had probable cause to arrest the defendant for breaking and entering with the intent to trespass. The Commonwealth contends, therefore, that the officers were justifiably in hot pursuit of someone who had just committed a jailable misdemeanor when they followed the defendant into the residence. See generally Jewett, supra at 629-635.[6] We disagree.

Probable cause to arrest "exists, where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense." Commonwealth v. Franco, 419 Mass. 635, 639 (1995), quoting from Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992). Here, there was no reason to believe that the defendant

---

[6] Police may lawfully arrest an individual without a warrant for committing a misdemeanor, such as breaking and entering with the intent to commit a misdemeanor (trespass), G. L. c. 266, § 16A, when the crime constitutes a breach of the peace, is committed in their presence, and is still continuing at the time of the arrest. Jewett, 471 Mass. at 630, 633.

entered the residence unlawfully. When Beliveau and his partner first observed the defendant, he was seated in a legally parked vehicle on a residential street and was only forty to fifty feet from that residence. He entered the residence through a side door without the use of force or a key. Moreover, the police encounter had attracted the attention of a woman, who the defendant identified as his mother, and other individuals gathered on the street, and no one, including the individuals in the residence, gave any indication that the defendant was an intruder or unwelcomed. Contrast Commonwealth v. Small, 10 Mass. App. Ct. 606, 610 (1980) (defendant's arrest based on information supplied by neighbor who had observed defendant attempt to break and enter nearby home). In these circumstances, there was an objectively reasonable possibility that the defendant lived or was welcomed at that address. To the extent the police may have doubted this conclusion, that doubt was not the equivalent of establishing probable cause to believe the defendant entered the residence illegally.[7]

b. Emergency aid. The Commonwealth also contends that the entry was justified under the emergency aid exception to the

---

[7] Given our conclusion, we pretermit any discussion of the issue, implicit in the Commonwealth's argument, of whether the police are permitted to pursue a suspect into a third party's home.

warrant requirement.[8]  That doctrine presents another narrow exception to the warrant requirement, but it does not lend justification for the police entry here.  See Commonwealth v. Duncan, 467 Mass. 746, 749 (2014).

The emergency aid exception permits the police to enter a home without a warrant when two requirements are met.  First, the police must "have an objectively reasonable basis to believe that there may be someone inside who is injured or in imminent danger of physical harm."  Id. at 749-750, quoting from Commonwealth v. Peters, 453 Mass. 818, 819 (2009).  Second, "the conduct of the police following the entry must be reasonable under the circumstances."  Duncan, supra at 750, quoting from Peters, supra at 823.  "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."  Duncan, supra at 750 (quotation omitted).

Here, the police were investigating civil marijuana possession when the defendant fled into a nearby residence.  As discussed above, the entry presented no reasonable suggestion

---

[8] Although the Commonwealth relies on the so-called "community caretaking" exception to justify the police action, that exception has been "applied almost exclusively in situations involving searches or seizures of automobiles." Commonwealth v. Duncan, 467 Mass. 746, 743 n.3 (2014).  We therefore review the claim under the emergency aid exception that permits the police to enter a home without a warrant.  See id. at 749-750.

that it was unauthorized. Moreover, there was no suggestion of an imminent risk of physical harm to anyone in the residence. See Peters, supra at 824 (second protective sweep of home not justified where officers no longer had reasonable grounds that anyone in home required assistance or was missing). There was also no evidence that the defendant was armed and dangerous. See Commonwealth v. Dyette, 87 Mass. App. Ct. 548, 560 (2015) (no testimony that police saw concealed bulge or defendant grabbed at his waistband, pressed his waist, ran stiff-armed or in otherwise awkward manner, or engaged in any furtive gesture).

We acknowledge that in these circumstances the combination of the defendant's extreme nervousness and flight during a lawful stop may have given rise to some suspicion of criminal activity, but without more there was no reasonable suspicion that the defendant had a gun. Cf. Commonwealth v. Sykes, 449 Mass. 308, 314-315 (2007); Commonwealth v. Monteiro, 71 Mass. App. Ct. 477, 479-480 (2008).[9] The defendant's nervousness alone cannot "be the grounding factor on which to base suspicion of criminal activity." Cruz, 459 Mass. at 468.

In Sykes, a "close case," the police had reasonable suspicion to believe that the defendant was carrying a gun

---

[9] Contrast Commonwealth v. Warren, 475 Mass. 530, 538-540 (2016) (flight where suspect is black male stopped in streets of Boston and under no obligation to respond to police inquiry should be given "little, if any, weight as a factor probative of reasonable suspicion").

where, in addition to his nervousness and his peculiar behavior of abandoning his bicycle in an effort to escape the police, there was evidence that the pursuit occurred in a high crime area, and the police observed the defendant "clench[ing] his waistband" while he ran down the street. Sykes, supra at 314-315. Similarly, in Monteiro, the police had reasonable suspicion that the defendant was carrying a weapon where the defendant, after receiving a hand gesture from one of four males gathered on the street and known to police for their involvement with gun-related incidents (the "functional equivalent" of a high crime area), left on his bicycle that he later "dropped" in order to run, had a "panicked look," and was seen by police "pulling at his waistband" as he ran. Monteiro, supra at 478-479. Neither of those additional factors are present here. There is no testimony that this was a high crime area or its functional equivalent. See Sykes, supra at 314-315; Monteiro, supra at 479. Nor did police observe the defendant grab, clench, or pull at his waist or waistband. See Sykes, supra at 315; Monteiro, supra at 478.

Furthermore, that the defendant fled during the patfrisk of the passenger adds little, if nothing. To begin with, it appears that the defendant, who was preparing his exit from the inception of the encounter, was intent on running from police well before the patfrisk of one of his companions. In addition,

even if the defendant's flight was triggered by the patfrisk, the existence of a reasonable belief that the passenger possessed a gun did not give rise to a reasonable basis to suspect the defendant of possessing one.  See generally Commonwealth v. Wing Ng, 420 Mass. 236, 237 (1995) (police must be able to point to "specific, articulable facts that warrant a reasonable suspicion that the particular individual might be armed and a potential threat to the safety of the officer or others").

In sum, because no view of the evidence lends itself to a reasonable belief that the defendant possessed a gun or was otherwise a danger to himself or anyone else, we see no "objectively reasonable grounds to believe that emergency aid might be needed."  Commonwealth v. Gordon, 87 Mass. App. Ct. 322, 329 (2015) (quotation omitted).  See, e.g., Peters, 453 Mass. at 823-824 (first warrantless entry of house permitted where police knew gun had been fired likely from inside, where people had been arguing, and where moments later man left and drove away); Commonwealth v. Copney, 468 Mass. 405, 411 (2014) (warrantless entry of college dormitory room justified where student's identification had been used to access building at time of shooting, student had not been seen twenty-four hours following shooting, student had not responded to knocks or

calls, school dean had reported being concerned, and room's light and window remained open).

c. Exclusionary rule's deterrent effect. Finally, the Commonwealth asserts that, in any event, based on these facts, the exclusionary rule should not apply because it would not result in an "appreciable deterrence" of police misconduct. We are not convinced. "The right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy. It was just this sort of intrusion that the Fourth Amendment [to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights] [were] designed to circumscribe by the general requirement of a judicial determination of probable cause." Peters, 453 Mass. at 819, quoting from Commonwealth v. DeJesus, 439 Mass. 616, 619 (2003).

Conclusion. The order denying the motion to suppress is reversed. The judgment is reversed and the finding is set aside.

So ordered.